# EXHIBIT 1

Candice Adams
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 26984555
2024LA000410
FILEDATE: 4/3/2024 10:34 AM
Date Submitted: 4/3/2024 10:34 AM
Date Accepted: 4/3/2024 11:44 AM
PF

**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**
**DUPAGE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| DUPAGE GRAUE MILL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | **2024LA000410** |
| | ) | |
| v. | ) | Case No. 2024 _____ |
| | ) | |
| UNITED STATES LIABILITY INSURANCE | ) | **JURY TRIAL DEMANDED** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

Plaintiff, DuPage Graue Mill Corporation, an Illinois not-for-profit corporation ("DGMC"), for its Complaint for Declaratory and other Relief against Defendant United States Liability Insurance Company ("Insurer"), states:

**NATURE OF THE ACTION**

1. This is an insurance coverage case brought by DGMC against Insurer based on Insurer withholding monies due and owing to DGMC as reimbursement for the necessary and reasonable costs incurred by DGMC to defend itself against claims covered under a purchased insurance policy. Despite repeated effort by DGMC to obtain reimbursement over an extended period of time, Insurer has refused to reimburse DGMC and deprived DGMC of the purchased coverage without reason and in bad faith. Worse yet, the Insurer initially appointed counsel for DGMC that for 2 ½ months represented DGMC while failing to disclose its conflicts-of-interest, causing DGMC to incur extensive legal fees and potentially other harm.

2. DGMC seeks damages to remedy Insurer's contractual breaches, vexatious conduct, wilful and wanton misconduct, and unfair and bad faith practices.

<u>PARTIES</u>

3.      DGMC is an Illinois not-for-profit corporation that does business in Oak Brook, DuPage County, Illinois.

4.      Through December 31, 2022, DGMC operated a restored nineteenth century gristmill on property licensed from the Forest Preserve District of DuPage County in Oak Brook, Illinois ("Graue Mill"). Since December 31, 2022, DGMC has continued its mission of educating and exhibiting to the public about the vast history of the Fullersburg (Oak Brook/Hinsdale) area, which extensively includes the Underground Railroad.

5.      On information and belief, Insurer is an insurance company organized under the laws of Nebraska with its principal place of business at 1190 Devon Park Dr., Wayne, Pennsylvania, 19087.

6.      On information and belief, Insurer is licensed to and does conduct business in the state of Illinois, including business within DuPage County.

7.      On information and belief, Insurer is part of Berkshire Hathaway, marketing itself as the best insurance company to underwrite insurance for small businesses and identifying its focus on the following values: caring, attitude, respect, empathy, and energy.

<u>JURISDICTION AND VENUE</u>

8.      This Court has personal jurisdiction over Insurer as Insurer: (a) transactions business in Illinois pursuant to 735 ILCS 5/2-209(a)(1); (b) has committed the tortious acts alleged herein within Illinois pursuant to 735 ILCS 5/2-209(a)(2); (c) as alleged herein, contracted to provide insurance to DGMC, which was located within Illinois at the time of contracting pursuant to 735 ILCS 5/2-209(a)(4); and (5) similarly, as alleged herein, has made and performed a contract substantially connected with Illinois pursuant to 735 ILCS 5/2-209(a)(7).

9.     Venue is proper pursuant to 735 ILCS 5/2-101 as at least some part of the transactions out of which this lawsuit arises occurred in DuPage County, and, alternatively, because Insurer is a nonresident of Illinois.

<u>**FACTS**</u>

***The Policy***

10.     During all times relevant to its claims, DGMC maintained certain liability insurance coverages through Insurer and more specifically, non-profit management liability coverage.

11.     DGMC issued a non-profit management liability policy, numbered NDO1052450Q, to DGMC (the "Policy").

12.     DGMC purchased the Policy from Insurer by paying the premium charged by Insurer.

13.     A true and accurate copy of the Policy is attached hereto as **Exhibit 1** and incorporated by reference as if set forth fully herein.

14.     DGMC is the "Named Insured" and the "Parent Organization" under the Policy. Ex. 1, Policy Declarations.

15.     The period of the Policy is May 2, 2022 to May 2, 2023. Ex. 1, Policy Declarations, Item II.

16.     The Policy provides limits of $1,000,000 each claim and $1,000,000 in the aggregate under the Non Profit Directors and Officers Liability Coverage Part. Ex. 1, Policy Declarations, Item III.

17.     The Policy identifies the insured(s) retention as $0 each claim under the Non Profit Directors and Officers Liability Coverage Part. Ex. 1, Policy Declarations, Item IV.

18.     The Directors and Officers Coverage Part of the Policy contains an insuring clause for Organization Coverage that states as follows:

> The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period, if applicable.

Ex. 1, D&O Part, I.C.

19.     The Policy defines **Claim**, in part, to mean any of the following:

1. Written demand for monetary damages or non-monetary relief, including injunctive relief;
2. Civil proceeding commenced by service of a complaint or similar pleading;
3. Criminal proceeding commenced by the return of an indictment;
4. Administrative or regulatory proceeding commenced by the filing of a formal written notice of charges, notice of violations, notice of investigation, cease and desist or similar action;
5. Arbitration, mediation or other alternative dispute resolution proceeding in which the **Insured** is obligated to participate if the **Insured** agrees to participate with the **Company's** prior written consent; or
6. Other proceeding initiated before any governmental body which is authorized to render an enforceable judgment, order for monetary damages or other relief;

> Received by, or brought or initiated against any **Insured** alleging a **Wrongful Act**, including any appeal therefrom.

Ex. 1, D&O Part, III.

20.     The Policy defines **Wrongful Act** broadly to mean any: "actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties; **Personal Injury Wrongful Act**; **Publisher Wrongful Act**; or **Employed Attorney Services**" committed or allegedly committed by the **Organization.** Ex. 1, D&O Part, III.

21.     The Policy defines **Organization** to mean, among other things, the **Named Insured** and any **Subsidiary.** Ex. 1, General Terms and Conditions, I.

22.     The Policy states that Insurer "shall have the right and duty to defend any **Claim** covered by the **Policy** even if the allegations are groundless, false or fraudulent." It further states

that Insurer shall have the right to appoint counsel of its choice with respect to such **Claim**. Ex. 1, General Terms and Conditions, II.

23.     The Policy states that if a **Claim** against an **Insured** is for both **Loss** that is covered by the **Policy** and loss that is not covered by the **Policy**, Insurer will pay 100% of **Defense Costs** on account of such **Claim**. Ex. 1, General Terms and Conditions, II.

*The Claims*

24.     DGMC operated and maintained the Graue Mill property, or parts of it, since the 1950's pursuant to a number of agreements, the last of which expired on December 31, 2022.

25.     Disputes arose between DGMC and Forest Preserve District upon the termination of their 70-year relationship when the Forest Preserve District barred DGMC from reentering the property and involved authorities.

26.     On or about January 20, 2023, DGMC received a grand jury subpoena that was initiated by the Forest Preserve District, likely to buttress their impending civil suit that was filed days later as alleged below.

27.     A true and accurate copy of the grand jury subpoena is attached as **Exhibit 2** hereto and incorporated by reference as if set forth fully hereon.

28.     The grand jury subpoena is a "Claim" under the Policy.

29.     On or about February 1, 2023, Forest Preserve District initiated a civil suit against DGMC.

30.     A true and accurate copy of the civil lawsuit is attached as **Exhibit 3** hereto and incorporated by reference as if set forth fully hereon.

31.     The civil suit against DGMC is a "Claim" under the Policy.

32.     DGMC required immediate legal representation and retained Thompson Coburn LLP to protect its interests.

33.     DGMC incurred and paid necessary and reasonable legal fees charged by Thompson Coburn LLP to defend DGMC.

34.     Among other things, Thompson Coburn LLP, on behalf of DGMC, analyzed DGMC's rights and responsibilities, opened discussions with Forest Preserve District's counsel to deescalate the disputes and to attempt to come to a reasonable resolution, worked to determine the property in dispute and ensure its safety pending resolution, secured and gathered documentation sought by Forest Preserve District, assessed the best response to the claims made, secured a joint representation agreement with a co-defendant, and dealt with FOIA requests. For ease of reference, legal work performed by Thompson Coburn LLP prior to February 10, 2023 is referred to as "Pre-Tender Defense Costs."

35.     DGMC timely provided notice to Insurer of the grand jury subpoena and civil suit on or about February 10, 2023, tendering both and seeking all coverages available under the Policy.

36.     Insurer suffered no prejudice as a result of Thompson Coburn LLP's work reflected in the Pre-Tender Defense Cost, instead benefitting greatly from such legal services.

### *Insurer's Claims Handling*

37.     Thompson Coburn LLP provided additional reasonable and necessary legal work to defend DGMC while awaiting a coverage decision from Insurer.

38.     On or about February 15, 2023, Insurer refused DGMC's request to allow Thompson Coburn LLP to act DGMC's going forward defense counsel with respect to the civil suit by Forest Preserve District.

39.     On or about February 15, 2023, Insurer appointed the law firm of Downey & Lenkov ("Insurer's Conflicted Appointed Counsel") as defense counsel for DGMC in the civil suit.

40.     Insurer's appointment of Insurer's Conflicted Appointed Counsel as defense counsel for DGMC did not provide DGMC with appropriate defense counsel as Insurer's Conflicted Appointed Counsel proved conflicted, but DGMC was unaware of the conflict at the time of appointment.

41.     Insurer refused to provide coverage, including defense counsel, to DGMC with respect to the grand jury subpoena.

42.     In the absence of appointed counsel by the Insurer, Thompson Coburn LLP assumed the defense of the DGMC as to the grand jury proceedings, including the grand jury subpoena.

43.     Upon appointment of Insurer's Conflicted Appointed Counsel, DGMC and Thompson Coburn LLP sought to transition the defense to Insurer's Conflicted Appointed Counsel, but Insurer's Conflicted Appointed Counsel failed to take control of the defense requiring Thompson Coburn LLP's continued work to defend DGMC. It was not until April 27, 2023, when Insurer's Conflicted Appointed Counsel finally disclosed its conflict to DGMC that DGMC realized that perhaps counsel was not taking a lead role in defending DGMC because of counsel's undisclosed conflict.

44.     DGMC, through its counsel Thompson Coburn LLP, made repeated efforts in writing and through telephone call to the Insurer to obtain reimbursement to DGMC for defense costs paid for Pre-Tender Defense Costs, Thompson Coburn LLP's costs to defend the civil suit as it sought to transition work to Insurer's Conflicted Appointed Counsel and necessitated as

Insurer's Conflicted Appointed Counsel failed to take an active role in defense of the civil suit, and to respond to the grand jury subpoena. For ease of reference, defense costs billed by Thompson Coburn LLP for the civil suit after February 10, 2023 are referred to as "Post-Tender Defense Costs."

45.     During communications with Insurer, Insurer agreed to pay Post-Tender Defense Costs, but refused to commit to paying Pre-Tender Defense Costs or costs to respond to the grand jury subpoena.

46.     On or about April 27, 2023, Insurer's Conflicted Appointed Counsel advised DGMC that it was withdrawing from the civil suit due to a conflict of interest not previously disclosed to DGMC.

47.     After Thompson Coburn LLP filed a motion to quash the grand jury subpoena, the DuPage County State's Attorney withdrew the subpoena and terminated the matter on May 23, 2023.

48.     Following Insurer's Conflicted Appointed Counsel's withdrawal from the civil suit, Insurer appointed a new insurance defense firm to defend DGMC.

49.     Despite the appointment of a new defense counsel, Thompson Coburn LLP was forced to remain involved to protect DGMC's interest in the civil suit as the defense provided by Insurer required some period of time for transition and due to unfamiliarity with the dispute.

50.     DGMC provided all invoicing to Insurer for Pre-Tender and Post-Tender Defense Costs, repeatedly seeking that Insurer reimburse such costs.

51.     The subpoena is a "Claim" made during the period of the Policy, triggering the insuring agreement for Organization Coverage under the Directors and Officers Coverage Part of the Policy.

52. The civil suit is a "Claim" made during the period of the Policy, triggering the insuring agreement for Organization Coverage under the Directors and Officers Coverage Part of the Policy.

53. To properly satisfy its defense obligations for "Claims" under the Policy, Insurer is required to provide a competent attorney that is free of conflict and able to adequately protect DGMC's interests.

54. While DGMC provided prompt notice of the "Claims" to insurer, it necessarily incurred Pre-Tender Defense Costs that prove reasonable and did not prejudice Insurer, but instead benefitted Insurer.

55. Due to the appointment of defense counsel in the civil suit that proved conflicted, failed to assume active responsibility in DGMC's defense, or required additional time to familiarize themselves with the legal and factual disputes, DGMC necessarily incurred Post-Tender Defense Costs that prove reasonable and did not prejudice Insurer, but instead benefitted Insurer.

56. DGMC additionally incurred reasonable and necessary costs to defend against the grand jury subpoena that ultimately led to the termination of the grand jury proceeding directed at DGMC.

57. Further, on or about August 10, 2023, DGMC learned of yet another legal matter that was initiated by the Forest Preserve District against DGMC, namely an inquiry from the Illinois Attorney General's Office that significantly overlapped with the civil lawsuit. A true and correct copy of the Illinois Attorney General inquiry is attached as **Exhibit 4**.

58.     DGMC immediately made a claim to the Insurer, on August 10, 2023, upon learning of the Illinois Attorney General inquiry. The Insurer, however, has yet to provide a coverage decision as to this claim.

59.     The Illinois Attorney General inquiry is a "Claim" under the Policy.

60.     DGMC total incurred defense costs are at least $115,000 for Pre-Tender Defense Costs, Post-Tender Defense Costs, costs relating to defense of the grand jury proceedings, and costs related to the Illinois Attorney General inquiry.

61.     DGMC has demanded that Insurer reimburse its Pre-Tender Defense Costs, Post-Tender Defense Costs, and fees associated with defending the grand jury proceedings, but Insurer has failed to pay any amounts. DGMC has demanded that the Insurer cover the Claim attendant to the Illinois Attorney General inquiry.

62.     DGMC has fully complied with all conditions of the Policies or they are otherwise futile, unenforceable, or waived through Insurer's actions and inactions.

**COUNT I**
**(BREACH OF CONTRACT)**

63.     DGMC re-alleges and incorporates by reference paragraphs 1 through 62.

64.     DGMC purchased the Policy for valuable consideration, by means of premium paid to Insurer.

65.     The Policy is a contract of insurance that is valid and enforceable against Insurer in accordance with its terms.

66.     Pursuant to the Policy, the grand jury subpoena qualified as a "Claim" satisfying the insuring agreement in the Policy for Organization Coverage under the Directors and Officers Liability Part.

67.     Pursuant to the Policy, the civil suit qualified as a "Claim" satisfying the insuring agreement in the Policy for Organization Coverage under the Directors and Officers Liability Part.

68.     Pursuant to the Policy, the Illinois Attorney general inquiry qualified as a "Claim" satisfying the insuring agreement in the Policy for Organization Coverage under the Directors and Officers Liability Part.

69.     Insurer improperly denied coverage for defense costs to respond to the grand jury proceedings.

70.     While now resolved, DGMC incurred defense costs responding to the grand jury proceedings that Insurer should have covered under the Policy but for Insurer's improper denial.

71.     DGMC incurred Pre-Tender Defense Costs that benefitted the defense of the civil suit and caused no prejudice to Insurer that Insurer should have reimbursed under the Policy.

72.     DGMC incurred Post-Tender Defense Costs while waiting on Insurer's coverage position for the civil suit, due to conflict of interest of the first appointed counsel and/or such counsel's inability to assume responsibility for the defense of the civil suit, and due to transition time required by the second appointed counsel.

73.     Insurer has repeatedly stated that it agrees to pay Post-Tender Defense Costs, which should be covered under the Policy, but has failed to do so despite repeated request.

74.     Insurer has failed to even respond, as of the filing of this lawsuit, with a coverage decision as to the Illinois Attorney General inquiry "Claim."

75.     Insurer failed and refused to honor its obligations to DGMC for said claims and in denying coverage and in denying coverage for the grand jury proceedings, refusing to defend or reimburse defense for the civil suit, and refusing to cover the Illinois Attorney General inquiry, all in contravention of the terms and conditions of the Policy.

76.     Insurer's actions and inactions with respect to DGMC are in breach of the Policy.

77.     As a result of Insurer's breaches of its contractual obligations under the Policy, DGMC has been damaged in a sum of at least $115,000, plus pre-judgment interest for such liquidated sums, attorneys' fees and costs incurred in this action, all to be proven at the time of trial.

For relief, DGMC respectfully requests that this Honorable Court enter judgment in its favor and against Insurer in the amount of at least $115,000, plus pre-judgment and post-judgment interest, costs, and reasonable attorneys' fees incurred herein, and such additional relief as is appropriate.

## COUNT II
## (VEXATIOUS REFUSAL/BAD FAITH)

78.     DGMC re-alleges and incorporates by reference paragraphs 1 through 77.

79.     Insurer owed certain duties to DGMC.

80.     Insurer's duties included, but were not limited to:

a.      an obligation to provide coverage unless Insurer had a good-faith belief based on its investigation or other available information that no coverage existed under the Policy;

b.      an obligation to conduct any necessary investigation into coverage and/or the facts surrounding coverage with ordinary and/or reasonable care and advise DGMC of Insurer's position on coverage under all relevant provisions in the Policies; and

c.      an obligation to pay qualified and competent counsel, free of conflicts of interest, to defend DGMC;

d.      an obligation to make reimbursement payments on amounts reasonably and necessarily incurred by DGMC to defend itself reflected in Pre-Tender Defense Costs and Post-Tender Defense Costs; and

     e.  an obligation to make reimbursement payments on Post-Tender Defense Costs that DGMC repeatedly recognized and admitted it had an obligation to satisfy.

     f.  an obligation to timely respond with its coverage position to the Illinois Attorney General inquiry.

81.    Insurer knew at all relevant times that the Claims against DGMC are covered under the Policy and that Insurer has an obligation to satisfy DGMC's reimbursement requests under the Policy and otherwise provide coverage for the claims under the Policy.

82.    At all material times and in doing the acts alleged herein, Insurer knew or should have known that the terms and conditions of the Policies required Insurer to pay DGMC reimburse of the defense costs incurred by DGMC, including the Pre-Tender Defense Costs, Post-Tender Defense Costs, defense costs to respond to the grand jury proceedings, and defense costs relating to the Illinois Attorney General inquiry.

83.    Acting oppressively, outrageously, and in bad faith towards DGMC, and in conscious disregard for the law and DGMC's known rights and with the intention of wrongfully interfering with DGMC's prospective economic advantage and property interest in the benefits of the Policy, and of intentionally causing, or willfully disregarding the probability of causing, unjust hardship to the non-profit DGMC, Insurer failed to pay such sums by improperly denying coverage for the grand jury proceedings, failing to recognize DGMC's policy rights, failing to make promised reimbursement payments of Post-Tender Defense Costs, refusing to pay Pre-Tender Defense Costs, refusing to cover the Illinois Attorney General inquiry, and failing to otherwise act in good faith. Insurer compounded its mistreatment of DGMC when it stood resolute in its positions despite identification of Insurer's failures, ignored numerous communications from DGMC, and failed to follow through on promises it made to reimburse DGMC.

84.     Insurer, through its foregoing actions and inactions, breached its duties, including its implied duties under the Policy, owed to DGMC.

85.     Insurer, through its foregoing actions and inactions, was and is in violation of the terms, provisions, and intent of the Policy and was and is acting vexatiously and without reasonable cause or excuse.

86.     As a direct and proximate result of Insurer's failure to exercise ordinary and/or reasonable care, Insurer's bad-faith, and breach of the implied covenant of good faith and fair dealing, DGMC has been damaged in an amount to be proven at trial.

87.     Insurer's actions were intentional, willful, wanton, reckless, or with conscious disregard for DGMC's welfare.

88.     As a result, DGMC is further entitled to an award of its costs and fees in pursuing coverage, such statutory penalty as may be awarded under applicable law for vexatious refusal under 215 ILCS 5/155, and/or punitive damages in an amount according to proof at trial necessary to punish Insurer and deter such conduct.

For relief, DGMC respectfully requests that this Honorable Court enter judgment in its favor and against Insurer in an amount to be proven at trial, but no less than $115,000 in compensatory damages, plus pre-judgment interest, post-judgment interest, attorneys' fees and costs incurred herein, statutory penalties and/or punitive damages sufficient to punish and deter, and such additional relief as is appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of any and all issues properly triable by a jury.

Respectfully submitted,


By  */s/ Caroline Pritikin*
    Robert H. Lang
    Matthew S. Darrough
    Caroline Pritikin
    Thompson Coburn LLP
    55 E. Monroe St., 37th Floor
    Chicago, Illinois 60603
    312-346-7500
    FAX 312-580-2201
    rlang@thompsoncoburn.com
    mdarrough@thompsoncoburn.com
    cpritikin@thompsoncoburn.com
    Firm No. 14100

    *Attorneys for Plaintiff*

Candice Adams
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 26984555
2024LA000410
FILEDATE: 4/3/2024 10:34 AM
Date Submitted: 4/3/2024 10:34 AM
Date Accepted: 4/3/2024 11:44 AM
PF

## IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
## DUPAGE COUNTY, ILLINOIS

| | | |
|---|---|---|
| DUPAGE GRAUE MILL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **2024LA000410** |
| v. | ) | Case No. 2024 _____ |
| | ) | |
| UNITED STATES LIABILITY INSURANCE | ) | **JURY TRIAL DEMANDED** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT

I, Caroline Pritikin, hereby certify pursuant to Section 5/1-109 of the Illinois Code of Civil Procedure as follows:

This affidavit is made pursuant to Illinois Supreme Court Rule 222(b). The undersigned certifies that the total of money damages sought in Plaintiff DuPage Graue Mill Corporation's Complaint against Defendant United States Liability Insurance, exceeds $50,000.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Date: April 3, 2024

_____

Caroline Pritikin
Counsel for DuPage Graue Mill Corporation

# EXHIBIT 1

NDO1052450P

Renewal of Number

**POLICY DECLARATIONS**

**No. NDO1052450Q**

**United States Liability Insurance Company**

**1190 Devon Park Drive, Wayne, Pennsylvania 19087**

A Member Company of United States Liability Insurance Group

Home Office Copy

Direct Bill Policy

NAMED INSURED AND ADDRESS:

**DUPAGE GRAUE MILL CORPORATION**

**3800 SOUTH YORK ROAD**

**OAK BROOK, IL 60523**

POLICY PERIOD: (MO. DAY YR.)  From:  05/02/2022  To:  05/02/2023

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

BUSINESS DESCRIPTION:  Non-Profit Directors and Officers

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

|  | PREMIUM |
|---|---|
| Non Profit Management Liability Coverage Parts | $886.00 |
| Wholesaler Broker Fee | $50.00 |
| **TOTAL:** | **$936.00** |

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue

**See Endorsement EOD (1/95)**

Agent:  **RPS MAVON (1221)**
**10 West Chicago Avenue**
**Hinsdale, IL  60521-3499**

Broker:  Mavco Insurance Agency
10 West Chicago Avenue
Hinsdale, IL  60521

Issued:  **04/05/2022 9:40 AM**

By: _Thomas P. Nerney_

Authorized Representative

UPD (08-07)

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

# EXTENSION OF DECLARATIONS

**Policy No. NDO1052450Q**

Effective Date: **05/02/2022**

12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

---

**FORMS AND ENDORSEMENTS**

---

**The following forms apply to the Management Liability coverage part**

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| DO-100 | 05/17 | Directors and Officers Coverage Part |
| DO-101 | 05/17 | Employment Practices Coverage Part |
| DO-283 | 11/17 | Data and Security Plus Endorsement |
| DO-290 | 05/17 | Fair Labor Standards Act Endorsement - Defense Costs and Indemnity Coverage |
| DO-298 | 05/17 | Amendment of Prior or Pending Litigation Exclusion |
| DO-GTC | 05/17 | General Terms and Conditions |
| DO-IL | 03/18 | Illinois State Amendatory Endorsement |
| Jacket | 07/19 | Policy Jacket |

# NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS

**PLEASE READ YOUR POLICY CAREFULLY.**

**THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE. DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**No. NDO1052450Q**

Effective Date: **05/02/2022**

12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

**DUPAGE GRAUE MILL CORPORATION
3800 SOUTH YORK ROAD
OAK BROOK, IL 60523**

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:  05/02/2022  To:  05/02/2023

## Non Profit Directors and Officers Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | | |
|---|---|---|
| a. Non Profit Directors & Officers | $1,000,000 | EACH CLAIM |
| b. Non Profit Directors & Officers | $1,000,000 | IN THE AGGREGATE |

| | | |
|---|---|---|
| ITEM IV. RETENTION: | $0 | EACH CLAIM |
| ITEM V. PREMIUM: | $698 | |
| RETROACTIVE DATE: | Full Prior Acts | |
| PRIOR OR PENDING LITIGATION | See form DO-298 | |

## Employment Practices Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

| | | |
|---|---|---|
| a. Employment Practices | $1,000,000 | EACH CLAIM |
| b. Employment Practices | $1,000,000 | IN THE AGGREGATE |
| ITEM IV. RETENTION: | $0 | EACH CLAIM |
| ITEM V. PREMIUM: | $188 | |
| RETROACTIVE DATE: | Full Prior Acts | |
| PRIOR OR PENDING LITIGATION | See form DO-298 | |

---

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

**DO-150 (02/09)**

**NON PROFIT MANAGEMENT LIABILITY COVERAGE PART DECLARATIONS**

**PLEASE READ YOUR POLICY CAREFULLY.**

**THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

No.  **NDO1052450Q**                          Effective Date:  **05/02/2022**

                                                          12:01 AM STANDARD TIME

## Fiduciary Liability Coverage Part

ITEM III. LIMITS OF LIABILITY

    a. Fiduciary Liability                NOT COVERED

ITEM IV. RETENTION:                      NOT COVERED

ITEM V. PREMIUM:                         NOT COVERED

ITEM VI. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:

    **See Endorsement EOD (01/95)**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

**Non-Profit Management Liability Policy**         **Directors and Officers Coverage Part**

In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this **Coverage Part**, the **Company** and the **Insureds** agree as follows:

Words that are in bold have special meaning and are defined in Section III. DEFINITIONS of this **Coverage Part**, or in Section I. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

I.      INSURING AGREEMENTS

|  |  |
|---|---|
| A.  Individual Insured – Non-Indemnified Coverage | The **Company** will pay, on behalf of an **Individual Insured**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, to the extent such **Individual Insured** is not indemnified by the **Organization** for such **Loss** and **Defense Costs**. |
| B.  Individual Insured – Indemnified Coverage | The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against an **Individual Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, but only to the extent the **Organization** indemnifies such **Individual Insured** for such **Loss** and **Defense Costs** as permitted or required by law. |
| C.  Organization Coverage | The **Company** will pay, on behalf of the **Organization**, **Loss** and **Defense Costs** resulting from a **Claim** first made against the **Organization** during the **Policy Period**, or the Extended Reporting Period, if applicable. |

II.      INDIVIDUAL INSURED – NON-INDEMNIFIED COVERAGE ADDITIONAL LIMIT

|  |  |
|---|---|
| "Dedicated Limit – Insuring Agreement A" | The **Company** shall pay an additional limit of liability, not to exceed an aggregate of $1,000,000 per **Policy Period**, solely for **Loss** covered under Section I. INSURING AGREEMENT, Subsection A. Individual Insured Non-Indemnified Coverage. This additional limit of liability shall be paid only after the applicable Limit of Liability for Individual Insured – Non-Indemnified Coverage of the Directors & Officers Liability **Coverage Part** shown in the Policy Declarations is completely exhausted by payment of **Loss**. |

III.      **DEFINITIONS**

**Claim**                    means any:

1. written demand for monetary damages or non-monetary relief, including injunctive relief;
2. civil proceeding commenced by service of a complaint or similar pleading;
3. criminal proceeding commenced by the return of an indictment;
4. administrative or regulatory proceeding commenced by the filing of a formal written notice of charges, notice of violations, notice of investigation, cease and desist or similar action;
5. arbitration, mediation or other alternative dispute resolution proceeding in which the **Insured** is obligated to participate  if the **Insured** agrees to participate with the **Company's** prior written consent; or
6. other proceeding initiated before any governmental body which is authorized to render an enforceable judgment, order for monetary damages or other relief;

received by, or brought or initiated against any **Insured** alleging a **Wrongful Act**, including any appeal therefrom.

**Claim** also means any:

7. written request, first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1. through 6. above.

A **Claim** shall be deemed made on the earliest of the date of service upon, or receipt by, any **Insured** of a potential **Claim** as described in subparagraphs 1. through 7. above.

**Defense Costs**         means:

1. reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insured**; and

2. all other fees, costs, costs of attachment or similar bonds (without any obligation on the **Company's** part to apply for or furnish such bonds);

resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** does not include **Loss** or the **Insured's** salaries, wages, overhead or benefits expenses.

**Employed Attorney Services**    means legal services provided by any **Individual Insured**, but only to the extent that such services are performed directly to the **Organization** and in the **Individual Insured's** capacity as an **Employee** of the **Organization**.

Any services rendered by an **Individual Insured** for any party other than the **Organization** shall not constitute **Employed Attorney Services**.

**Employee**    means any natural person whose labor or service is engaged and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns.

**Executive**    means any natural persons who are directors, trustees, officers, managing members, advisory board members or committee members or any equivalent position of the **Organization**.

**Excess Benefit Transaction**    means a transaction as defined in Internal Revenue Code, Title 26 §4958 (c)(1).

**Excess Benefit Transaction Excise Tax**    means any excise tax imposed by the Internal Revenue Service, pursuant to Section 4958(a)(2) of the Internal Revenue Code, 26 U.S.C. § 4958(a)(2), against an **Individual Insured** who participated as an **Organization Manager** in connection with an **Excess Benefit Transaction**.

**Individual Insured**    means any past, present or future:

1. **Executive**;
2. **Employee**; or

3. the estates, heirs, legal representatives or assigns of 1. and 2., above in the event of their death, incapacity or bankruptcy.

**Loss**  means the amount the **Insured** becomes legally obligated to pay as a result of a **Claim**, including:

1. damages, settlements and judgments;
2. pre-judgment and post judgment interest;
3. punitive or exemplary damages to the extent such damages are insurable under applicable law, statute or regulation;
4. the multiplied portion of any multiple damage award to the extent such damages are insurable under applicable law, statute or regulation; and
5. any ten percent (10%) **Excess Benefit Transaction Excise Tax** assessed by the Internal Revenue Service against any **Individual Insured**, subject to a $100,000 maximum sublimit of liability per **Policy Period** for **Loss** and **Defense Costs**, combined provided, however that indemnification by the **Organization** for such taxes is not expressly prohibited in the bylaws, certificate of incorporation or other governing documents of the **Organization**. This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations.

For the purpose of determining the insurability of damages in items 3. and 4. above, the laws of the jurisdiction most favorable to the insurability of such damages shall control; provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

However, **Loss** does not include:

1. fines, penalties, sanctions and forfeitures;
2. taxes, except for any ten percent (10%) **Excess Benefit Transaction Excise Tax** as outlined in subparagraph 5. above of this definition of "**Loss**", or as otherwise provided by endorsement;
3. any amount uninsurable under the law pursuant

to which this **Policy** is construed;

4. cost of compliance with any order for, grant of or agreement to provide non-monetary or injunctive relief;

5. any unpaid salary, wages, commissions, severance, bonus or incentive compensation that is due or alleged to be due to any person; or

6. any amount for which an **Individual Insured** is absolved from payment by reason of any covenant, agreement or court order.

**Organization Manager**

means a person or persons described in Internal Revenue Code, Title 26 §4958(f).

**Outside Entity**

means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended), that is not an **Insured**.

**Outside Capacity**

means the service, other than **Employed Attorney Services,** of an **Individual Insured** while acting in the capacity of director, officer, trustee, managing member or any equivalent position of an **Outside Entity,** but only if such service is provided on behalf of the **Outside Entity** with the specific knowledge, request, consent or direction of the **Named Insured**.

**Personal Injury Wrongful Act**

means any actual or alleged false arrest, wrongful detention, malicious prosecution, invasion of privacy, wrongful entry or eviction, libel, slander or defamation.

**Pollutants**

means any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica', asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or
2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or
3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.
2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproduct such as mycotoxin, mildew, or biogenic aerosol.
3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.
4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

**Publisher Wrongful Act**     means any infringement of copyright, trademark, unauthorized use of title, or plagiarism or misappropriation of ideas.

**Wrongful Act**     means any:

1. actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duties;
2. **Personal Injury Wrongful Act**;
3. **Publisher Wrongful Act**; or
4. **Employed Attorney Services**

committed or allegedly committed by:

a. the **Organization**;
b. any **Individual Insured,** arising solely from duties conducted on behalf of the **Organization** or asserted against an **Individual Insured** because of 1. above; or
c. any **Individual Insured** while acting in an **Outside Capacity**.

---

IV.   EXCLUSIONS

A. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

Conduct

1. deliberately fraudulent act, omission, criminal act, or willful violation of any statute or regulation by any **Insured**; or
2. any **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled;

provided that this exclusion will not apply to **Defense Costs** incurred until:

a. a final, non-appealable adjudication in any underlying proceeding or action establishes such conduct; or
b. the **Insured** has admitted, stipulated or pleaded no contest to such conduct;

Bodily Injury/Property Damage

1. bodily injury, assault, battery, sickness, disease, death, mental anguish, humiliation or emotional distress of any person; or
2. damage to or destruction of any tangible property including any resulting loss of use thereof;

provided that this exclusion shall not apply to any mental anguish, humiliation or emotional distress asserted in an otherwise covered **Claim** alleging a **Personal Injury Wrongful Act**.

Employee Benefits

pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or

any amendments thereof or regulations promulgated there under) or similar provisions of any federal, state or local statutory law or common law;

Insured vs Insured

**Claim** brought by or on behalf of any **Insured**; provided that this exclusion shall not apply to:

1. any derivative action on behalf of, or in the name or right of the **Organization,** if such action is brought and maintained independent of and without the solicitation, assistance, participation or intervention of any **Insured**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by any **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**;
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Organization**; or
4. any **Claim** brought and maintained by or on behalf of any former **Executive**, but only if such **Claim** does not arise out of, directly or indirectly result from, is in consequence of, or in any way involves any **Wrongful Act**, responsibilities, actions or failure to act by any **Insured** during the tenure of service of such former **Executive**.

Employment Practices

refusal to employ, termination of employment, or employment related coercion, demotion, evaluation, reassignment, discipline, workplace conditions, false imprisonment, defamation, harassment, humiliation, or discrimination of employment, or other employment-related practices, policies, acts or omissions or sexual harassment by any **Insured** against any person(s) or entity; or negligence involving any of the foregoing;

it being understood that this exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity and to any obligation to contribute with or indemnify another with respect to such **Claim**;

Discrimination

discrimination, including but not limited to discrimination based on religion, race, creed, color, sex, age, marital status, sexual preference, pregnancy,

handicap or disability;

| | |
|---|---|
| Outside Entity vs. Insured | **Claim** made by or on behalf of an **Outside Entity** or one or more of the **Outside Entity's** directors, officers, trustees, managing members or any equivalent position against an **Individual Insured** acting in an **Outside Capacity**, provided, however that this exclusion shall not apply to: |

1. any **Claim** brought derivatively on behalf of the **Outside Entity,** independently and without the direct solicitation, participation, intervention or assistance of the **Outside Entity** or any **Insured** in an **Outside Capacity**;
2. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured** acting in an **Outside Capacity** and which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**; and
3. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Outside Entity** against an **Insured** acting in an **Outside Capacity** for such **Outside Entity**.

| | |
|---|---|
| Pollution | |

1. discharge, emission, release, seepage, migration, dispersal or escape of **Pollutants** or any threat thereof, including nuclear reaction, radiation or contamination; or
2. treatment, removal or disposal of any **Pollutants**;
3. regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants**; or any voluntary decision to do so; or
4. actual or alleged property damage including loss of use, bodily injury, sickness, disease or death of any person, or financial loss to an **Organization** or **Outside Entity**, their security holders, or their creditors resulting from any of the aforementioned matters in 1., 2., or 3. above of this Exclusion.

| | |
|---|---|
| Prior or Pending Litigation | litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, which was pending on or prior to the Prior or Pending Litigation date referenced on the Policy Declarations, or any such action based on the same or essentially the same fact, circumstance, matter, situation, transaction or event underlying or alleged therein; |
| Prior Notice | 1. fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the effective date of this **Policy**, was the subject of any notice given under any similar policy of insurance; or<br>2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |
| Prior Wrongful Acts of Subsidiaries | 1. **Wrongful Act** committed by an **Individual Insured** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or<br>2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |
| Professional Services | rendering or failure to render legal (except **Employed Attorney Services**), medical, psychological, counseling services or referrals, if the **Claim** is brought by or on behalf of any individual and/or entity for whom such services were, now are, or shall be performed;<br><br>provided that this exclusion shall not apply to that part of a **Claim** against an **Individual Insured** which alleges that the **Individual Insured**, in his or her capacity as such, failed to supervise those who performed such services. |

B. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for actual or alleged:

| | |
|---|---|
| Contract | liability of the **Insured** under any express contract or agreement to which an **Organization** is a party, provided that this exclusion shall not apply to: |

          1.  the extent that such **Organization** would have been liable in the absence of such contract or agreement; and

          2.  any **Claim** against an **Individual Insured**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insured** for the purpose of determining the applicability of any of the above exclusions in Section A. or B. above.

---

## V.   ORDER OF PAYMENTS

In the event of **Loss** arising from a **Claim** for which payment is concurrently due under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage, and one or more of the other Insuring Agreements of this **Coverage Part**, the **Company** shall:

1. first pay **Loss** for which coverage is provided under Insuring Agreement A., Individual Insured - Non-Indemnified Coverage; then
2. with respect to whatever remaining amount of the Limit of Liability is available after payment above, pay such **Loss** for which coverage is provided under any other Insuring Agreement.

Except as otherwise provided above, the **Company** may pay covered **Loss** as it becomes due under this **Coverage Part** without regard to the potential for other future payment obligations under this **Coverage Part**.

---

## VI.   LIFETIME OCCURRENCE REPORTING PROVISION

A. If this Policy is cancelled or not renewed by the **Named Insured** for any reason other than being sold, acquired, or declaring bankruptcy, each **Individual Insured** who did not serve as such at the time of the cancellation or non-renewal, shall be provided with an unlimited extension of time to report any **Claim** first

made against such **Individual Insured** after the effective date of such cancellation or non-renewal, subject to the following conditions:

1. the **Claim** results from a **Wrongful Act** committed by the **Individual Insured** before the effective date of cancellation or non-renewal; and
2. the **Wrongful Act** was actually or allegedly committed during a **Policy Period** of a **Policy** issued by the **Company**; and
3. such **Individual Insured** was serving in such capacity during the **Policy Period** of a **Policy** issued by the **Company**; and
4. no Directors & Officers Liability policy, or similar policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is first made against such **Individual Insured**; and
5. the **Claim** is not otherwise excluded by the **Policy** issued by the **Company** in effect at the time the **Wrongful Act** actually or allegedly occurred; such **Policy** shall be the **Policy** under which coverage is applicable including all terms, conditions, limits, retentions, and endorsements therein.
6. the **Company** will have written continuous coverage for **Named Insured** from the effective date of the first **Policy** the **Company** issued to the date of cancellation or non-renewal of this **Policy**.

B. The LIFETIME OCCURRENCE REPORTING PROVISION described herein shall not apply to any **Claim** made against any **Individual Insured** caused by, arising or resulting, directly or indirectly from or in consequence of the **Individual Insured's** serving in an **Outside Capacity** for an **Outside Entity**.

---

VII.    TIMELY NOTICE AND RESOLUTION INCENTIVE

Retention Forgiveness

In the event of a **Claim**, the **Company** shall waive the applicable retention under this **Coverage Part**, up to a maximum of  $10,000, if each of the following conditions are met:

1. The **Claim** is reported to the **Company** within thirty (30) days of first receipt by an **Insured**; and
2. The **Company** successfully negotiates a

settlement of the **Claim** within the Limits of Liability of this **Coverage Part**; and

3. The **Insured** consents to the settlement of the **Claim** without condition within thirty (30) days after notice of the settlement is provided to the **Insured** by the **Company**; and

4. Settlement of the **Claim** is finalized by the **Company** within ninety (90) days of the **Claim** being first reported to the **Company**.

VIII. OUTSIDE DIRECTORSHIP PROVISION

In the event a **Claim** is made against any **Individual Insured** arising out of their service as a director, officer, trustee, managing member or any equivalent positions of an **Outside Entity**, coverage afforded under this **Policy** shall be excess of any indemnification provided by the **Outside Entity** and any insurance provided to the **Outside Entity** which covers its directors, trustees, officers, managing members or any equivalent position.

**Non-Profit Management Liability Policy**          **Employment Practices Coverage Part**

In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this **Coverage Part**, the **Company** and the **Insureds** agree as follows:

Words that are in bold have special meaning and are defined in Section II. DEFINITIONS of this **Coverage Part**, or in Section I. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

---

I.   INSURING AGREEMENTS

The **Company** will pay on behalf of an **Insured, Loss** and **Defense Costs** resulting from a **Claim** first made against an **Insured** during the **Policy Period** or during any Extended Reporting Period, if applicable, by or on behalf of:

A.  Employment Practices Liability

any **Employee** or applicant for employment for a **Wrongful Employment Act**; or

B.  Third Party Liability

any natural person, other than an **Employee**, for a **Wrongful Third Party Act**.

---

II.   DEFINITIONS

**Claim**          means any:

1.  written notice received by an **Insured** that any person or entity intends to hold such **Insured** responsible for a **Wrongful Act**, including a written demand for monetary or non-monetary relief, including injunctive relief;
2.  civil proceeding commenced by the service of a complaint or similar pleading;
3.  formal civil, administrative or regulatory proceeding or formal civil, administrative or regulatory investigation, including any such proceeding brought by or in association with the Equal Employment Opportunity Commission or any similar federal, state or local agency with jurisdiction over an **Organization's** employment practices;
4.  arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document; or
5.  Notice of Violation or Order to Show Cause or

written demand for monetary relief or injunctive relief, commenced by the receipt by an **Insured** of such Notice, Order or written demand, issued by the Office of Federal Contract Compliance Programs;

received by, or brought or initiated against any **Insured** alleging a **Wrongful Act**, including any appeal therefrom.

**Claim** also means any:

6.  written request, first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1. through 5. above.

A **Claim** shall be deemed made on the earliest of the date of service upon, or receipt by, any **Insured** of a potential **Claim** as described in subparagraphs 1. through 6. above.

Notwithstanding the foregoing, **Claim** shall not include any labor dispute or grievance proceeding, arbitration or other proceeding brought against any **Insured** pursuant to a collective bargaining agreement.

**Confidential Employee Information**

means any non-public, personally identifiable information regarding an **Employee**, collected, stored or transmitted by an **Organization**, for the purpose of establishing or maintaining an employment relationship.

**Defense Costs**

means:

1.  reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend the **Insured**; and
2.  all other fees, costs, costs of attachment or similar bonds (without any obligation on the **Company's** part to apply for or furnish such bonds);

resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** does not include **Loss** or salaries, wages, overhead, benefits expenses of any **Individual Insured**.

**Employee**

means any natural person whose labor or service is engaged and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and

includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns.

**Employee Benefits**

means perquisites, fringe benefits, deferred compensation or payments (including insurance premiums) in connection with an employee benefit plan, and any other payment to or for the benefit of an **Employee** arising out of the employment relationship. **Employee Benefits** shall not include salary, wages, commissions, or non-deferred cash incentive compensation.

**ERISA or any similar act**

means the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law of the United States, Canada or their states, territories or provinces or any other jurisdiction anywhere in the world.

**Executive**

means any natural persons who serve as directors, trustees, officers, managing members, advisory board members or committee members or any equivalent position of the **Organization**.

**Fair Labor Standards Act Violation**

shall mean any actual or alleged violation of the Fair Labor Standards Act, any amendments thereto or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act, including misrepresentation under these laws. **Fair Labor Standards Act Violation** does not mean any actual or alleged violation of the Equal Pay Act, any amendments thereto or the provisions of any similar federal, state or local law.

**Harassment**

means:

1. sexual harassment including unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or create a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance; or
2. other workplace harassment, including workplace bullying, which creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance.

**Individual Insured**

means any past, present or future:

1. **Executive**;
2. **Employee**; or
3. the estates, heirs, legal representatives or assigns of 1. and 2. above in the event of their death, incapacity or bankruptcy.

**Loss**  means the amount the **Insured** becomes legally obligated to pay as a result of a **Claim**, including:
1. damages, settlements, and judgments;
2. front pay and back pay;
3. pre-judgment and post judgment interest;
4. liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act and the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local law, statute or regulation;
5. punitive or exemplary damages to the extent such damages are insurable under applicable law, statute or regulation;
6. the multiplied portion of any multiple damage award to the extent such damages are insurable under applicable law, statute or regulation; and
7. attorney's fees awarded by a court against an **Insured** to a person or entity bringing a **Claim** or agreed to by the **Company**, in writing, in connection with a settlement;

For the purpose of determining the insurability of 4., 5., or 6. above the laws of the jurisdiction most favorable to the insurability of such damages shall control; provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

However, **Loss** does not include:
1. the cost of compliance with any order for, grant of, or agreement to provide non-monetary or injunctive relief;
2. costs associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state or local statutory or common law, including but not limited to the Americans with Disabilities Act, the

Civil Rights Act of 1964, or any amendments to or rules or regulations promulgated thereunder;

3. any amounts uninsurable under the law pursuant to which this **Coverage Part** is construed;

4. civil or criminal fines, penalties, taxes, sanctions or forfeitures imposed on an **Insured** whether pursuant to law, statute, regulation or court rule;

5. future salary, wages, commissions or **Employee Benefits** of a person bringing a **Claim** who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order, or other resolution of a **Claim**;

6. salary, wages, commissions, **Employee Benefits**, bonus or incentive compensation or other monetary payments which constitute severance payments or payments pursuant to a notice period;

7. **Employee Benefits** due or to become due or the equivalent value of such **Employee Benefits**, except with respect to any **Claim** for wrongful termination; or

8. any amount for which an **Individual Insured** is absolved from payment by reason of any covenant, agreement or court order.

**Retaliation**                        means retaliatory treatment against an **Employee** because of:

1. the exercise of or attempt to exercise an **Employee's** rights under law or for otherwise engaging in any legally protected activity;

2. refusing to violate any law or opposing any unlawful practice;

3. having cooperated in a proceeding or investigation (including an internal investigation by an **Organization's** human resources department or legal department) into alleged unlawful activity by an **Insured**;

4. disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law by an **Insured** and/or the **Organization**;

5. filing any claim against the **Organization** under any federal, state or local whistleblower law including Federal False Claims Act, or Sarbanes-Oxley; or

6. **Employee** strikes or slowdowns.

**Wrongful Act**                       means any **Wrongful Employment Act** or **Wrongful**

**Third Party Act**.

| | |
|---|---|
| **Wrongful Employment Act** | means any actual or alleged: |

1. violation of any federal, state or local laws (whether statutory or common) prohibiting discrimination in employment based on a person's race, color, religion, creed, genetic information, age, gender or gender identity, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, any protected military status, or any other status that is protected pursuant to any such laws;

2. **Harassment**;

3. **Retaliation**;

4. wrongful: termination, dismissal or discharge of employment, whether actual or constructive;

5. wrongful: demotion; denial of tenure; failure or refusal to hire or promote; denial of seniority; failure to employ; or wrongful or negligent employee reference;

6. wrongful employment-related: misrepresentation; defamation, humiliation, libel or slander; negligent evaluation; wrongful discipline; wrongful deprivation of career opportunity; negligent retention, supervision, hiring or training; emotional distress, mental anguish, invasion of privacy or false imprisonment;
   but only when alleged as part of a **Claim** for an act described in 1. through 5. above;

7. wrongful failure to adopt or enforce consistent employment-related corporate workplace policies and procedures arising from 1. through 6. above;

8. breach of any express or implied contract, including any contract arising out of any personnel manual, employee handbook, policy statement or other representation; or

9. unauthorized use or disclosure of **Confidential Employee Information**;

committed or allegedly committed by an **Organization** or by an **Individual Insured** while acting in his or her capacity as such by any means including the internet, social media, email, or telecommunications systems.

| | |
|---|---|
| **Wrongful Third Party Act** | means any actual or alleged: |

      1. discrimination based on race, color, religion, creed, genetic information, age, gender or gender identity, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, any military protected status, or any other status that is protected pursuant to any federal, state or local statutory or common law;

      2. harassment of either a sexual nature or other unwelcome conduct; or

      3. violation of civil rights relating to such discrimination or harassment;

against any natural person, other than an **Employee**, committed or allegedly committed by an **Organization** or by an **Individual Insured** while acting in his or her capacity as such, by any means including the internet, social media or email, or telecommunication systems.

III.   EXCLUSIONS

A. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for:

Bodily Injury/ Property Damage       any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property including any resulting loss of use; provided that this exclusion shall not apply to any mental anguish, emotional distress, invasion of privacy, humiliation, libel, slander or defamation asserted in an otherwise covered **Claim** alleging a **Wrongful Act**.

Violation of Law       any actual or alleged violation of:

      1. **ERISA or any similar act** (except Section 510 of ERISA), or any other federal, state or local statutory or common law anywhere in the world governing any employee benefit program, policy, plan or arrangement of any type, including but not limited to laws governing retirement or pension benefit programs, welfare plans, insurance plans, employee stock options, employee stock ownership plans, employee stock purchase plans or deferred compensation programs;

      2. the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended or any other similar federal, state or

local statutory or regulatory law or common law anywhere in the world;

3. any law governing workers' compensation, unemployment insurance, social security, disability benefits or any other similar federal, state or local statutory or regulatory law or common law anywhere in the world;

4. the Occupational Safety and Health Act of 1970 (OSHA), as amended, or any other federal, state or local statutory or regulatory law or common law anywhere in the world governing workplace safety and health;

5. the Workers' Adjustment and Retraining Notification Act, Public Law 100-379 (1988), as amended, or any other federal, state or local statutory or regulatory law or common law anywhere in the world governing an employer's obligation to notify or bargain with others in advance of any facility closing or mass layoff; or

6. the National Labor Relations Act, as amended, or any other federal, state or local statutory or regulatory law or common law anywhere in the world governing employees' rights and employers' duties with respect to unions, bargaining, strikes, boycotts, picketing, lockouts or collective activities;

however, the foregoing shall not apply to any **Claim** alleging **Retaliation** (including any **Claim** alleging retaliation in violation of Section 510 of ERISA) or wrongful termination of employment whether actual or constructive, because of an **Employee's** exercise of a right pursuant to any such laws.

B. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** (except where otherwise noted) in connection with any **Claim** made against an **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged:

Prior or Pending Litigation

litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured**, which was pending on or prior to the Prior or Pending Litigation date referenced on the Policy Declarations, or any such action based on the same or essentially the

same fact, circumstance, matter, situation, transaction or event underlying or alleged therein;

| Prior Notice | |
|---|---|
| | 1. fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the effective date of this **Policy**, was the subject of any notice given under any similar policy of insurance; or |
| | 2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |

| Prior Wrongful Acts of Subsidiaries | |
|---|---|
| | 1. **Wrongful Act** committed by an **Individual Insured** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or |
| | 2. other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph 1. above, would constitute **Interrelated Wrongful Acts**; |

| Wage and Hour | **Fair Labor Standards Act Violation** |
|---|---|

| Breach of Employment Contract | breach of any express employment contract or express employment agreement; provided that this exclusion shall not apply to: |
|---|---|
| | 1. **Loss** to the extent an **Insured** would have been liable for such **Loss** in the absence of such contract or agreement; or |
| | 2. **Defense Costs**. |

---

## IV. LIFETIME OCCURRENCE REPORTING PROVISION

A. If this Policy is cancelled or not renewed by the **Named Insured** for any reason other than being sold, acquired, or declaring bankruptcy, each director or officer who did not serve as such at the time of the cancellation or non-renewal, shall be provided with an unlimited extension of time to report any **Claim** first made against such

director or officer after the effective date of such cancellation or non-renewal, subject to the following conditions:

1. the **Claim** results from a **Wrongful Act** committed by the director or officer before the effective date of cancellation or non-renewal; and

2. the **Wrongful Act** was actually or allegedly committed during a **Policy Period** of a **Policy** issued by the **Company**; and

3. such director or officer was serving in such capacity during the **Policy Period** of a **Policy** issued by the **Company**; and

4. no Directors & Officers Liability policy, or similar policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is first made against such director or officer; and

5. the **Claim** is not otherwise excluded by the Policy issued by the **Company** in effect at the time the **Wrongful Act** actually or allegedly occurred; such **Policy** shall be the **Policy** under which coverage is applicable including all terms, conditions, limits, retentions, and endorsements therein.

6. the **Company** will have written continuous coverage for **Named Insured** from the effective date of the first **Policy** the **Company** issued to the date of cancellation or non-renewal of this **Policy**.

B. The LIFETIME OCCURRENCE REPORTING PROVISION described herein shall not apply to any **Claim** made against any director or officer caused by, arising or resulting, directly or indirectly from or in consequence of the director or officer serving in an **Outside Capacity** for an **Outside Entity**.

---

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

---

# DATA & SECURITY+ ENDORSEMENT

It is hereby agreed:

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement. This endorsement is part of and subject to the provisions of the **Policy** to which it is attached.

## I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of coverages and Limits of Liability provided by this endorsement.

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| A.  **Data Breach** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| B.  **Identity Theft** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| C.  **Workplace Violence Act** Expense | $50,000 each claim<br>$50,000 in the aggregate |
| D.  **Kidnapping** Expense | $50,000 each claim<br>$50,000 in the aggregate |

The maximum aggregate per **Policy Period** for A. through D. above shall be $200,000 in the aggregate.

No retentions shall apply to the sublimits shown above.

## II.  COVERAGES:

A.  **Data Breach** Expense
    The **Company** will pay on behalf of the **Organization** up to the **Data Breach** Expense Limit of Liability stated in the schedule above, for reasonable and necessary expenses in items 1. through 6. below:
    1.  Development of a plan to assist the **Organization** in responding to a **Data Breach**;
    2.  Data analysis or forensic investigation to assess the scope of a **Data Breach**;
    3.  The development, printing and mailing of legally required notification letters to those affected by a **Data Breach;**

4. Development of a website link for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent;

5. Development of a customer relationship management system for use by the **Organization** in communicating with persons affected by a **Data Breach** after legally required notification letters are sent**;**

6. Public relations services or crisis management services retained by the **Organization** to mitigate the adverse affect on the **Organization's** reputation resulting from a **Data Breach** that becomes public and only after legally required notification letters are sent.

incurred by the **Organization** as a result of a **Data Breach.** The **Data Breach** must first occur, be discovered by an **Insured**, and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Data Breach** is first discovered by an **Insured**. The expenses below must be incurred within one (1) year of the reporting of such **Data Breach**:

The **Organization** must first report the **Data Breach** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above costs.

B. **Identity Theft** Expense

The **Company** will pay on behalf of a director or officer of the **Organization** up to the **Identity Theft** Expense Limit of Liability stated in the schedule above, for expenses, services or fees noted in items 1. through 3. below:

1. Credit monitoring services provided by a vendor of the **Company's** choice for the affected director or officer for up to one year following an **Identity Theft;**

2. Additional application fees paid by a director or officer whose loan(s) were rejected based on incorrect credit information resulting from an **Identity Theft**;

3. Notary fees, certified and overnight mail expenses paid by a director or officer in connection with reporting an **Identity Theft** to financial institutions, credit bureaus and agencies and law enforcement authorities.

incurred by such director or officer after he or she has become a victim of **Identity Theft.** The **Identity Theft** must first occur, be first discovered by an **Insured,** and reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the **Identity Theft** is first discovered by an **Insured.** The expenses above must be incurred within one (1) year of the reporting of such **Identity Theft**:

Any director or officer of the **Organization** who is a victim of **Identity Theft** must first report the **Identity Theft** to the **Company** and use a service provider of the **Company's** choice prior to incurring any of the above expenses, services or fees.

C. **Workplace Violence Act** Expense

The **Company** will reimburse the **Organization,** up to the **Workplace Violence Act** Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** for a period of thirty (30) days following, and as a result of, a **Workplace Violence Act**:

1. Counseling services rendered to **Employees** and persons on the **Organization's**

**Premises** directly affected by a **Workplace Violence Act**. The counseling services must be rendered by a licensed, professional counselor of the **Organization's** choice.

2. Services rendered by an independent public relations consultant of the **Organization's** choice for the purpose of mitigating the adverse affect of a **Workplace Violence Act** on the **Organization**.

To be covered, the **Workplace Violence Act** must occur during the **Policy Period** and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

D. **Kidnapping** Expense

The **Company** will reimburse the **Organization,** up to the **Kidnapping** Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** as a result of a **Kidnapping:**

1. Retaining an independent negotiator or consultant to facilitate the release of a **Kidnapping** victim. Nothing herein shall obligate the **Company** to recommend, select, retain or arrange for the retention of such independent negotiator or consultant;

2. Interest on a loan obtained by the **Organization** to pay expenses covered under this endorsement that is incurred as a result of a **Kidnapping.** However, there is no coverage for interest accruing prior to thirty (30) days preceding the date of such payment or subsequent to the date the **Company** pays any portion of a **Kidnapping** Expense or for expenses not covered under this endorsement;

3. Travel and accommodations incurred by the **Organization** in direct response to the **Kidnapping.** Nothing herein shall obligate the **Company** to recommend, select, or arrange for such travel and accommodations;

4. A reward up to $10,000 paid by the **Organization** to an informant for information which leads to the arrest and conviction of the person(s) responsible for the **Kidnapping**;

5. The current base salary paid to a director or officer of the **Organization** for the director or officer's work on behalf of the **Organization**, who is a victim of a **Kidnapping** subject to the following:

   a. salary reimbursement shall commence on the thirty-first (31st) consecutive day after a **Kidnapping**;

   b. salary reimbursement shall end when the director or officer is released; or is confirmed dead; or one hundred and twenty (120) days after the director or Officer is last confirmed to be alive; or twelve (12) months after the date of the **Kidnapping**, or when the **Kidnapping** Expense Limit of Liability has been exhausted by payments made by the **Company**, whichever occurs first.
   There is no coverage for **Kidnapping** Expense resulting from a **Kidnapping** planned, carried out or participated in, directly or indirectly, by any person who is or was a member of the victim's family or the **Organization**.

The **Kidnapping** must occur and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence.

III. ADDITIONAL DEFINITIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section III. DEFINITIONS, is amended by the addition of the following definitions:

**Data Breach**

means the misappropriation or public disclosure, by electronic or non-electronic means, by the **Organization** and without the knowledge of, consent, or acquiescence of the president, member of the board of directors or any executive officer, of an individual(s) **Personally Identifiable Information** in the **Organization's** care, custody and control without the authorization or permission of the owner of such information.

**Identity Theft**

Means:

1. the act of obtaining **Personally Identifiable Information** belonging to a director or officer of the **Organization** without that person's authorization, consent or permission; and
2. the use of **Personally Identifiable Information** so obtained to make or attempt to make transactions or purchases by fraudulently assuming that person's identity.

**Identity Theft** does not mean any of the above committed directly or indirectly by a director or officer of the **Organization,** or by a family member of any director or officer.

There is no coverage for any **Identity Theft** Expense unless **Personally Identifiable Information** that is obtained without authorization, consent or permission is used to make or attempt to make purchases or conduct transactions by fraudulently assuming the identity of a director or officer of the **Organization**.

**Kidnapping**

means an actual or alleged wrongful abduction and involuntary restraint of a director or officer of the **Organization**, by one or more persons acting individually or collectively in which monetary or non-monetary demands are made to the **Organization** to obtain the director's or officer's release.

**Personally Identifiable Information**

means:

1. information concerning an individual(s) that

would be considered "non-public information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to Social Security numbers or account numbers correlated with names and addresses which is in an Insured's care, custody and control; and

2. personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and

3. protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPPA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111- 5), as amended, and any regulations promulgated thereto. **Personally Identifiable Information** does not mean information that is available to the public which does not include otherwise protected personal information.

**Premises**                    means buildings, facilities or properties leased or owned by the **Organization** in conducting its operations.

**Workplace Violence Act**      means an actual use of unlawful deadly force, or the threatened use of unlawful deadly force involving the display of a lethal weapon, occurring on the **Organization's Premises** and directed at an **Individual Insured,** or other persons on the **Premises** of the **Organization**.

## IV. LIMITS OF LIABILITY AND RETENTION

1. The maximum Limit of Liability for any expenses provided by this endorsement shall be in addition to the Limits of Liability as set forth in the Policy Declarations for the Directors and Officers **Coverage Part**.

2. Any one incident, interrelated incidents or series of similar or related incidents for which coverage is provided under this endorsement shall be treated as one incident subject to the maximum Limit of Liability available under this endorsement at the time the incident(s) is first reported to the Company regardless of whether the incident(s) continues and expenses are incurred by the Organization in any subsequent Policy Period(s).

V.  ADDITIONAL EXCLUSIONS

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, is amended by the addition of the following:

Data Breach Related

1. Expense reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled;
2. expenses incurred by any **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**;
3. expenses arising from any incident(s) of which any **Insured** had notice before the inception date of this Policy; or any fact, circumstance, event, situation or incident which before the inception date of this Policy was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this Policy based upon such pending or prior notice;
4. The portion of any expenses covered under this endorsement that is also covered under any other coverage part of this **Policy**;
5. Reissuance of credit or debit cards or any other expense not shown in Section II, COVERAGES, sub-section A, **Data Breach** Expense.

VI. COVERAGE LIMITATIONS

The following terms, conditions and exclusions in the General Terms and Conditions and the Directors and Officers **Coverage Part** do not apply to this endorsement:

1. General Terms and Conditions
   a.  Section II. EXTENDED REPORTING PERIOD
   b.  Section XI. SPOUSAL AND DOMESTIC PARTNER EXTENSION
2. Directors and Officers **Coverage Part**
   a.  Section IV. EXCLUSIONS, Subsection A. "Bodily Injury/Property Damage"
   b.  Section VI. LIFETIME OCCURRENCE REPORTING PROVISION

c.  Section VIII. OUTSIDE DIRECTORSHIP PROVISION

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

---

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

---

## FAIR LABOR STANDARDS ACT ENDORSEMENT
## DEFENSE COSTS AND INDEMNITY COVERAGE

It is hereby agreed that the Employment Practices **Coverage Part**, Section I. INSURING AGREEMENTS, is amended by the addition of the following:

C.  Fair Labor Standards Act Defense Costs and Indemnity Coverage

1.  any **Employee** for a **Fair Labor Standards Act Violation**; provided that this Insuring Agreement C. is subject to a maximum sublimit of liability of $100,000 per **Policy Period** for **Loss** and **Defense Costs**, combined. This sublimit of liability is part of and not in addition to the applicable Employment Practices Limit of Liability as set forth on the Policy Declarations, and is subject to the applicable Retention for the Employment Practices Liability **Coverage Part.**

It is also agreed that the Employment Practices **Coverage Part**, Section III. EXCLUSIONS, Subsection B. "Wage and Hour" is deleted in its entirety.

It is also agreed that the Employment Practices **Coverage Part**, Section II., DEFINITIONS, **Wrongful Act** is deleted and replaced by the following:

**Wrongful Act**

means any **Wrongful Employment Act,** any **Fair Labor Standards Act Violation,** or any **Wrongful Third Party Act**.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

---

This Endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

---

# AMENDMENT OF PRIOR OR PENDING LITIGATION EXCLUSION

It is hereby agreed that the Directors and Officers **Coverage Part**, Section IV. EXCLUSIONS, Subsection A. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation
Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Employment Practices **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation
Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

It is also agreed that the Fiduciary Liability **Coverage Part** (if purchased), Section III. EXCLUSIONS, Subsection B. "Prior or Pending Litigation" is deleted and replaced by the following:

Prior or Pending Litigation

Any litigation, demand, claim, arbitration, decree, judgment, proceeding, or investigation against any **Insured,** or any such action based upon the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein which was pending on or prior to the effective date of this **Policy**;

provided that, if this **Policy** is a renewal of a **Policy** previously issued by the **Company** in a continuous succession of **Policies** with no lapses in coverage, the effective date of this **Policy** will mean the effective date of the first **Policy** issued by the **Company** in such succession of **Policies.**

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

**Non-Profit Management Liability Policy**                    **General Terms and Conditions**

In consideration of the payment of the premium and reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and subject to all the provisions of this **Policy**, the **Company** and the **Insureds** agree as follows:

**NOTICE**: This is a Claims Made Policy. This means the **Company** will cover only those **Claims** first made against the **Insured** during the **Policy Period** or, where applicable, the Extended Reporting Period.

If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for the purposes of that **Coverage Part**.

Any bolded term in a **Coverage Part** that is defined in these General Terms and Conditions shall have the meaning set forth in these General Terms and Conditions. Any bolded term in a **Coverage Part** that is defined in that **Coverage Part** shall have the meaning set forth in such **Coverage Part**.

The descriptions in the headings and subheadings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage, and do not serve to express, confirm, alter or provide coverage.

I.       DEFINITIONS

| | |
|---|---|
| **Application** | means: |
| | 1. an application and any materials submitted for this **Policy**; and |
| | 2. an application and any materials submitted for all previous **Policies** issued by the **Company** providing uninterrupted coverage. |
| | The content of 1. and 2. above are incorporated by reference in this **Policy** as if physically attached hereto. |
| **Claim** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Company** | means the insurance company identified in the Policy Declarations. |
| **Coverage Part** | means individually or collectively, as applicable, the purchased coverage parts as set forth in the Policy Declarations as included and attached to and made a part of this **Policy**. |

| | |
|---|---|
| **Defense Costs** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Domestic Partner** | means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local laws. |
| **Employee** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Financial Impairment** | means: |

1. the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator, creditors committee or similar official to take control of, supervise, manage or liquidate the **Organization** and provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization** to indemnify an **Individual Insured** for a **Loss**; or
2. the **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

| | |
|---|---|
| **Insured** | means any **Organization** and any **Individual Insured**. |
| **Individual Insured** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Interrelated Wrongful Acts** | means any **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or that are logically or causally connected by reason of any common or related series of facts, circumstances, situations, transactions or events. |
| **Loss** | shall have the meaning as defined in the applicable **Coverage Part**. |
| **Management Control** | means: |

1. control of more than fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board

of trustees, or board of managers; or

2. control of exactly fifty percent (50%) of the voting rights representing the right to appoint, elect, or designate the majority of the board of directors, board of trustees, or board of managers; and pursuant to a written contract solely controls the management and operations of such entity.

**Named Insured**    means the entity named in Item 1. of the Policy Declarations.

**Organization**    means:

1. the **Named Insured** and any **Subsidiary**; and
2. any entity as debtor in possession under United States bankruptcy law or equivalent status under the law of any other jurisdiction.

**Plan**    shall have the meaning as defined in the applicable **Coverage Part**.

**Policy**    means collectively the Policy Declarations, General Terms and Conditions, applicable **Coverage Parts**, applicable endorsements, and the **Application**.

**Policy Period**    means the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date. If the length of the **Policy Period** is the same as the **Policy Year**, the terms **Policy Period** and **Policy Year** are used interchangeably herein.

**Policy Year**    means the period of one (1) year following the effective date of the **Policy Period** or any subsequent one-year anniversary thereof; or

In the event the **Policy** expires less than one (1) year following the effective date of the **Policy Period**; or more than one (1) year but less than two (2) years following the effective date of the **Policy Period**; then **Policy Year** shall mean any such period.

**Subsidiary**    means:

1. any not-for-profit entity in which the **Named Insured** has **Management Control** directly or indirectly through one or more **Subsidiaries** on or before the

effective date of this **Policy**; and is disclosed as a **Subsidiary** in an **Application** to the **Company**; or

2. any other entity added as a **Subsidiary** by written endorsement to this **Policy**.

**Takeover**  means:

1. the acquisition by another entity or person or group of entities or persons acting in concert of:
   a. the **Management Control** of the **Named Insured**; or
   b. the acquisition of more than fifty percent ( 50%) of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent consolidated financial statements prior to such acquisition;
2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity;
3. the consolidation of the **Named Insured** with another entity; or
4. the loss, forfeiture, or suspension of the **Named Insured's** tax exempt status.

**Wrongful Act**  shall have the meaning as defined in the applicable **Coverage Part**.

_____

II.  EXTENDED REPORTING PERIOD

Right to Purchase  If the **Policy** expires, is cancelled or not renewed for any reason other than non-payment of premium, then the **Named Insured** shall have the right to purchase an Extended Reporting Period to report to the **Company**, as soon as practicable prior to the expiration date of the purchased Extended Reporting Period, any **Claim** against an **Insured**.

An Extended Reporting Period shall only apply to **Claims** arising from a **Wrongful Act** which was actually or allegedly committed before the date of expiration, cancellation or non-renewal of this **Policy**, or prior to the effective date of any **Takeover**.  For the purpose of this clause, the offer of renewal terms and conditions or premiums by the **Company** different from those in effect prior to renewal shall not constitute a refusal to renew.

| | |
|---|---|
| Options | The additional premium for the Extended Reporting Period shall be a percentage of the total annual premium as shown in the Policy Declarations.  The **Named Insured** may elect any one of the following options: |

1. Twelve (12) month period - 30% of the annual premium;
2. Twenty Four (24) month period - 75% of the annual premium; or
3. Thirty Six (36) month period - 120% of the annual premium.

The Extended Reporting Period begins on the expiration date of the **Policy**, or if cancelled or non-renewed, the effective date of such cancellation or non-renewal of the **Policy**.

| | |
|---|---|
| Payment & Notice to the Company | As a condition precedent to the right to purchase an Extended Reporting Period, the total earned premium for this **Policy** must have been paid to the **Company**. Any premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.  The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium as set forth above, is received by the **Company** within sixty (60) days of the effective date of the expiration, nonrenewal or cancellation of this **Policy**. |
| Extended Reporting Period Limits & Other Insurance | The Extended Reporting Period will not provide a new, separate or additional Limit of Liability.  The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the effective date of the expiration, cancellation, or non-renewal is the maximum Limit of Liability for all **Claims** reported during the Extended Reporting Period. |

III.   DEFENSE & SETTLEMENT

| | |
|---|---|
| Duty To Defend | The **Company** shall have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are groundless, false or fraudulent.  The **Company** shall have the right to appoint counsel of its choice with respect to such **Claim.**  The **Company's** obligation to defend any **Claim** or pay any **Loss** or **Defense Costs** shall be completely |

fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Loss**.

Consent to Settle

The **Company**, as it deems necessary, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or in excess of the Retention. If the **Insured** refuses to consent to a settlement recommended by the **Company**, the **Company's** obligation to the **Insured** for **Loss** and **Defense Costs** attributable to such **Claim** shall be limited to:

a. The amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle; plus
b. covered **Defense Costs** incurred up to the date the **Insured** first refused to settle; plus
c. eighty percent (80%) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of a., b. and c. above is the limit of the **Company's** liability under this **Policy** for any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to Section IX. LIMITS OF LIABILITY and Section X. RETENTIONS AND PRESUMPTIVE INDEMNIFICATION of these General Terms and Conditions. The remaining twenty percent (20%) of **Loss** and **Defense Costs** in excess of the amount referenced in a. and b. above shall be the obligation of the **Insured**.

In no event shall the **Company** be obligated to pay any **Loss** or **Defense Costs** after the applicable Limit of Liability shown in the Policy Declarations has been exhausted by payment of **Loss**.

| | |
|---|---|
| Consent of the Company | The **Insured** shall not demand or agree to arbitration of any **Claim** without the **Company's** written consent. The **Insured** shall not, except at personal cost, make any offer or payment, admit any liability, settle any **Claim**, assume any obligation, or incur any expense without the **Company's** written consent. |
| Cooperation | The **Insured** agrees to cooperate with the **Company** with respect to all **Claims**, and provide such assistance and information as the **Company** may reasonably request. Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by the **Company's** representative, under oath if required, and shall attend hearings, depositions, trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**. The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure under this **Policy**. |
| Papers/Documents | The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the completion of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name, and shall provide all other assistance and cooperation which the **Company** may reasonably require. |

## IV.   ALLOCATION OF DEFENSE COSTS

If a **Claim** is made against an **Insured** for both **Loss** that is covered by this **Policy** and loss that is not covered by this **Policy**, the **Company** will pay as follows:

1.   One hundred percent (100%) of **Defense Costs** on account of such **Claim**; and

    2. all remaining loss from such **Claim** shall be apportioned between covered **Loss** and uncovered loss based on the relative legal exposures of the parties to such matters.

    3. Items 1. and 2. above of this Section IV. shall not apply to any **Insured** for whom coverage is excluded pursuant to Section VII. REPRESENTATIONS AND SEVERABILITY.

---

V.    NOTICE AND CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

Written Notice of a Claim

1. As a condition precedent to exercising any right to coverage under this **Policy**, the **Insured** shall give to the **Company** written notice of a **Claim** as soon as practicable after any Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** becomes aware of such **Claim**, however:

    a. if the **Policy** expires, is cancelled or is non-renewed and no Extended Reporting Period is purchased, no later than ninety (90) days after the expiration date or the effective date of such cancellation or non-renewal; or

    b. if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

However, if the **Policy** is cancelled for non-payment of premium, notice shall be provided by the **Insured** to the **Company** no later than the effective date of cancellation.

2. Coverage for a **Claim** reported to the **Company** during the automatic 90 day period noted in 1. a. above shall only apply if the **Claim** is first made prior to the date of the **Policy** expiration, cancellation, or non-renewal.

| | |
|---|---|
| Written Notice of a Circumstance | 1. If during the **Policy Period**, or any applicable Extended Reporting Period, the **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the **Company** as soon as practicable during the **Policy Period**, or Extended Reporting Period if applicable, in which the **Insured** first becomes aware of such circumstances, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the **Company**. Such subsequent **Claim** must be reported to the **Company** in accordance with this Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Written Notice of Claim" above. |
| | 2. When reporting a circumstance to the **Company**, an **Insured** shall give the names of any potential claimant; a description of the specific circumstances that could give rise to a **Claim**; the identity of the specific **Insureds** allegedly involved in such circumstance; the nature of the potential damages (monetary and non-monetary); and the specifics as to how the **Insureds** first became aware of such circumstance. |
| Interrelated Claims | More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on the earlier of: |
| | 1. the date on which the earliest **Claim** was first made; or |
| | 2. the first date valid notice was given by the **Insured** to the **Company**, in accordance with applicable reporting provisions, under this **Policy** or under any prior policy, of any **Wrongful Act** or any fact, circumstance, situation, transaction or event which underlies such **Claim**. |

---

## VI.    CANCELLATION OR NON-RENEWAL

| | |
|---|---|
| Cancellation by the Insured | This **Policy** may be cancelled by the **Named Insured** by either surrender thereof to the **Company** at its address stated in the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such |

cancellation shall be effective. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

Cancellation By the Company

The **Company** may cancel this **Policy** only in the event of the **Insured's** failure to pay the premium when due. The **Company** will mail to the **Named Insured**, written notice stating when cancellation shall take effect. The effective date of such cancellation shall not be less than twenty (20) days after the date of mailing. Earned premium shall be computed pro rata at the time cancellation is effected or as soon as practicable thereafter.

Non-Renewal

In the event the **Company** non-renews this **Policy**, the **Company** shall mail to the **Named Insured**, not less than sixty (60) days prior to the end of the **Policy Period**, written notice of non-renewal. Such notice shall be binding on all **Insureds**.

Delivery of Notice

The **Company** shall mail notice of cancellation or non-renewal with a certificate of mailing stating the effective date of cancellation or non-renewal which shall become the end of the **Policy Period**. Mailing of such notice shall be sufficient notice of cancellation or non-renewal.

## VII.   REPRESENTATIONS AND SEVERABILITY

Representations

The **Insured** represents that the particulars and statements contained in the **Application** are true and agree that:

1. those particulars and statements are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of the **Policy**;
2. those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and
3. the **Policy** is issued in reliance upon the truth of such representations.

Severability of Application

An **Application** for coverage shall be construed as a separate **Application** for coverage by each **Individual Insured**. With respect to the particulars and statements

contained in the **Application**, no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available.

In the event that such **Application** contains any misrepresentations which materially affects either the acceptance of the risk or the hazard assumed by the **Company** under this **Policy**, then no coverage shall be afforded for any **Claim** based upon, arising out of, related to or in consequence of any such misrepresentation with respect to:

1. any **Individual Insured** who knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations, or any **Organization** to the extent it indemnifies any such **Individual Insured**. Such knowledge possessed by such **Individual Insured** shall not be imputed to any other **Individual Insured;** or
2. any **Organization** if any past or present Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chairperson, Executive Director, Human Resources Manager, In-House General Counsel, Managing Member or Fiduciary of any **Plan** or any equivalent position of the **Named Insured**, or the signer of the **Application**, knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations.

---

VIII.  CHANGES IN EXPOSURE

Creation, Acquisition of or  Merger with Another Entity

1. If, after the effective date of this **Policy**:
   a. the **Organization** creates, acquires, consolidates or merges with another nonprofit entity incorporated under the laws of a jurisdiction within the territorial United States, (hereafter referred to as "other entity") such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, the other entity becomes a **Subsidiary** of the **Organization**, then coverage shall be provided for the other entity as an **Insured** solely for **Wrongful Acts** committed or

allegedly committed after the effective date of such creation, acquisition, consolidation or merger. The **Insured** shall disclose full particulars of such a change to the **Company** as soon as practicable but not later than the expiration date of the **Policy Year**, or effective date of cancellation or non-renewal of this **Policy**.

b. However, if at the time of an event described in Paragraph 1, a., above:

    i. the assets of the other entity exceed thirty five percent (35%) of the total assets of the **Organization** as reflected in the **Organization's** most recent annual financial statements; or

    ii. if the Employment Practices Liability Coverage Part is attached to this **Policy,** the total number of employees of the other entity exceeds thirty five (35%) of the total number of **Employees** of the **Organization** immediately prior to such event, then:

the **Named Insured** shall provide to the **Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

2. If, after the effective date of this **Policy**, the **Organization** creates, acquires, consolidates or merges with a for-profit entity, or any entity incorporated outside of the territorial United States, such that the **Organization** is the surviving entity, and if as a result of such creation, acquisition, consolidation or merger, such for-profit or foreign entity becomes a **Subsidiary** of the **Organization**, then:

the **Named Insured** shall provide to the

**Company** written notice of such creation, acquisition, consolidation or merger, containing full details thereof, as soon as practicable but within sixty (60) days of such event. The **Company**, at its sole discretion, may require additional premium and may alter the terms, conditions or limitations of coverage. The **Company** reserves the right to refuse any extension of coverage to such entity.

Cessation of Subsidiaries

If during the **Policy Period** any **Subsidiary** ceases to be a **Subsidiary**, then coverage under this **Policy** shall continue for such **Subsidiary** and its **Individual Insureds** until the expiration of this **Policy** or the last **Policy** in an uninterrupted series of policies issued by the **Company**, but solely for **Claims** arising out of **Wrongful Acts** committed or allegedly committed by such **Subsidiary** or its **Individual Insureds** while such **Subsidiary** was a **Subsidiary** and prior to the effective date of such cessation. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the effective date of cessation.

Takeover of the
Named Insured

In the event of a **Takeover** of the **Named Insured**:

1. coverage under this **Policy** shall continue until the earlier of:
   a. the expiration of the **Policy Year**; or
   b. if the **Policy** is cancelled or non-renewed, the effective date of cancellation or non-renewal;

   but only with respect to **Claims** arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the effective date of the **Takeover**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of **Takeover**;

2. the **Named Insured** shall give the **Company** written notice of the **Takeover** as soon as practicable, but not later than sixty (60) days after the effective date of the **Takeover**; and

3. the premium for the **Policy Year** in which the **Takeover** occurred shall be deemed to be fully

earned.  The **Named Insured** shall have the right to purchase an Extended Reporting Period, subject to Section II. EXTENDED REPORTING PERIOD herein, to report **Claims** arising out of **Wrongful Acts** occurring prior to the effective date of any **Takeover**.

Merger, Sale, Transfer or Termination of a Plan

If after the inception date of the Fiduciary Liability **Coverage Part,** or the date the Fiduciary Liability Coverage Endorsement is added to this **Policy**:

1. the sponsorship of a **Plan** is transferred so that an **Organization** is no longer the sole employer sponsor of such **Plan**;
2. a **Plan** is merged with another plan for which coverage is not afforded under the Fiduciary Liability **Coverage Part**;
3. a **Plan** is terminated or sold; or
4. the Pension Benefit Guaranty Corporation (PBGC) becomes the Trustee of a **Plan**;

then:

a. in the case of paragraphs 1., 2. and 3. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement, as applicable, shall continue to apply to such transferred, merged, terminated or sold **Plan**, but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date of such transfer, merger, termination or sale. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of merger, transfer, termination or sale of any **Plan** as described in paragraphs 1., 2. and 3. above; or
b. in the case of paragraph 4. above, the Fiduciary Liability **Coverage Part** or the Fiduciary Liability Coverage Endorsement shall continue to apply to such **Plan** for those who were **Insureds** at the time the PBGC became the Trustee of such **Plan** but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date the PBGC became

the Trustee of such **Plan**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date the PBGC becomes the Trustee of any **Plan**.

Cancellation of the Policy

If the **Named Insured** requests cancellation of this **Policy** as a result of a "Creation, Acquisition of or Merger with Another Entity", "Cessation of Subsidiaries", or "Takeover of the Named Insured", the **Company** shall compute earned premium on a pro rata basis and return any unearned premium to such entity as of the effective date of such cancellation as long as notice of the event is provided to the **Company** as soon as practicable but not later than sixty (60) days after such event, together with such information as the **Company** may require.

## IX. LIMITS OF LIABILITY

"Each Claim"

The "Each Claim" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for each **Claim** to which the applicable **Coverage Part** applies, during each **Policy Year**.

"In the Aggregate"

The "In the Aggregate" Limit of Liability shown on the Policy Declarations is the **Company's** maximum liability for **Loss** for all **Claims** to which the applicable **Coverage Part** applies, during each **Policy Year**.

Policy Year Limits

The Limits of Liability for any **Policy Year** may not be aggregated or transferred, in whole or in part, so as to provide any additional coverage with respect to **Claims** first made or deemed made, as provided in Section V. NOTICE AND CLAIM REPORTING PROVISIONS of these General Terms and Conditions during any other **Policy Year**. If the applicable Limits of Liability for any **Policy Year** are exhausted, the **Company's** obligation for that **Policy Year** shall be deemed completely fulfilled and extinguished.

Extended Reporting Period Limits

The Extended Reporting Period will not provide a new, separate or additional Limit of Liability. The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the date of expiration, cancellation, or non-renewal is the maximum Limit of Liability for all

|                       | **Claims** reported during the Extended Reporting Period. |
|-----------------------|-----------------------------------------------------------|
| Defense Costs | **Defense Costs** shall be in addition to the Limits of Liability for each **Coverage Part** purchased as shown on the Policy Declarations, unless as otherwise provided within that **Coverage Part** or by endorsement. |
| Interrelated Claims | More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** pursuant to Section V. NOTICE AND CLAIM REPORTING PROVISIONS, "Interrelated Claims" and shall be subject to the Limit of Liability in effect when the **Claim** was first made. |

X.    RETENTIONS AND PRESUMPTIVE INDEMNIFICATION

|            |            |
|------------|------------|
| Retentions | Retentions set forth in the Policy Declarations for each **Coverage Part** shall apply per **Claim** per **Policy Year** under each respective **Coverage Part**. |
|  | If more than one Retention applies to any one **Claim** then each applicable Retention shall be applied to the applicable part of such **Claim**, but the sum of such Retentions shall not exceed the highest of such applicable Retentions. |
|  | **Claims** shall be subject to the Retention applicable to the **Policy Year** during which the **Claims** are first made as provided in Section V. NOTICE AND CLAIM REPORTING PROVISIONS. |
|  | Except as otherwise provided by Section VII. TIMELY NOTICE AND RESOLUTION INCENTIVE of the Directors and Officers **Coverage Part**: |

1. the **Company** shall be liable to pay only **Loss** and **Defense Costs** in excess of the applicable Retention for the **Coverage Part** to which the **Claim** applies;
2. the **Company** shall have no obligation to pay any part or all of such Retention on the **Insured's** behalf; and
3. if the **Company**, at its sole discretion, elects to pay any part of or all of such Retention, the **Insured** agrees to repay such amounts to the **Company** upon demand.

| | |
|---|---|
| Presumptive Indemnification | Regardless of whether **Loss** or **Defense Costs** resulting from any **Claim** against an **Individual Insured** is actually indemnified by the **Organization**, the applicable Retention set forth in the Policy Declarations shall apply to any **Loss** and **Defense Costs** if indemnification of the **Individual Insured** by the **Organization** is legally permissible. The certificate of incorporation, charter, articles of association or other organizational documents of the **Organization**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Individual Insured** to the fullest extent permitted by law.

However, if an **Individual Insured** is not indemnified for **Loss** or **Defense Costs** solely by reason of:

1. **Financial Impairment**; or
2. a good faith determination by the **Organization** that such indemnification is not permitted by common or statutory law; then

an **Individual Insured's** Retention for this **Coverage Part** shall be amended to $0. |

XI.     SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of:

1. such spousal or **Domestic Partner** status; or
2. such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**; then

any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim.**

This extension of coverage shall not apply to the extent a **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement or neglect or breach

of duties by such spouse or **Domestic Partner**.

XII.    SUBROGATION

In the event of payment under this **Policy**, the **Company** shall be subrogated to the **Insureds'** rights of recovery. The **Insured** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Company** to effectively bring suit in the name of any **Company**.

In no event, however, shall the **Company** exercise its rights to subrogation against an **Individual Insured** under this **Policy** unless such **Individual Insured**:

1. has been convicted of a deliberate criminal act; or
2. has been determined by a final adjudication adverse to the **Individual Insured** to have committed a deliberate fraudulent act, or to have obtained any profit, advantage or remuneration to which such **Individual Insured** was not legally entitled.

In the event the **Company** shall for any reason pay indemnifiable **Loss** on behalf of an **Individual Insured**, the **Company** shall have the contractual right hereunder to recover from the **Organization** or any **Subsidiary** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Organization** or any **Subsidiary** and shall be subrogated to rights of the **Individual Insureds** hereunder.

XIII.   CHANGES

Notice to any agent or knowledge by any agent shall not affect a waiver or change in any part of this **Policy** or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this **Policy** be waived or changed except by an endorsement, issued by the **Company** to form a part of this **Policy**.

XIV.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this **Policy**, the **Insured** agrees that the **Named Insured** shall act on behalf of all **Insureds** with respect to:

1. the payment of premiums or the receipt of any return premiums that may become due under the **Policy**;
2. the cancellation or non-renewal of this **Policy**;
3. the effecting of any changes to the **Policy** or purchasing of an Extended Reporting Period; or
4. the giving and receiving of all notices and correspondence.

Any notice given to the **Named Insured** by the **Company** pursuant to Section VI. CANCELLATION OR NON-RENEWAL shall be deemed to be notice to all **Insureds**.

---

## XV.  ASSIGNMENT

Assignment of interest under this **Policy** shall not bind the **Company** until the **Company's** consent is endorsed hereon.

---

## XVI.  OTHER INSURANCE

This **Policy** is excess of other valid and collectable insurance, unless such other insurance is specifically written to be in excess of this **Policy**. For purposes of this provision, "other valid and collectable insurance" means insurance provided by an entity or organization other than the **Company**.

When it is determined that both this insurance and other insurance or self-insurance apply to any **Claim** on the same basis, whether primary, excess or contingent, the **Company** shall not be liable under this **Policy** for a greater proportion of the **Loss** and **Defense Costs** than the applicable Limit of Liability under the **Policy** for such **Loss** and **Defense Costs** bears to the total applicable Limit of Liability of all valid and collectible insurance against such **Claims**.

---

## XVII.  TERMS OF POLICY CONFORMED TO STATUTE

Terms of this **Policy** which are in conflict with the statutes of the state or territory wherein this **Policy** is

issued are hereby amended to conform to such statutes.

## XVIII. ACTION AGAINST THE COMPANY

Compliance

No action shall lie against the **Company** unless, as a condition precedent thereto, there has been full compliance with all of the terms of this **Policy**, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by the **Insured's** written agreement, the claimant or the claimant's legal representative, and the **Company**.

Rights to Recover

Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy** to the extent of the insurance afforded by this **Policy**. No person or entity shall have any right under this **Policy** to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or the **Insured's** legal representatives. Bankruptcy or insolvency of the **Insured** or the **Insured's** successors in interest shall not relieve the **Company** of its obligations hereunder.

## XIX. POLICY TERRITORY

This **Policy** shall apply worldwide.

## XX. COORDINATION OF COVERAGE

Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**, the **Company** will not pay more than the actual **Loss** incurred by the **Insureds**.

## XXI. ACCEPTANCE

This **Policy** embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

## XXII. LIBERALIZATION

If within forty-five (45) days of binding this **Policy**, the **Company** broadens coverage under any **Coverage Part** or the General Terms & Conditions attached to this

**Policy**, and;

1. such broadened coverage applies to policies in the state or territory in which this **Policy** is written;
2. the effective date of the policies which are to receive the broadened coverage is after the effective date of this **Policy**; and
3. there is no additional premium charged for such broadened coverage;

then the **Company** shall apply the broadened coverage to this **Policy** as applicable for no additional premium, but only for a **Wrongful Act** which first occurs after the effective date of such broadened coverage.

---

<div style="border:1px solid">

This endorsement modifies insurance provided under the following:

**NON PROFIT MANAGEMENT LIABILITY POLICY**

</div>

# ILLINOIS STATE AMENDATORY ENDORSEMENT

To be attached to and form a part of all Non Profit Management Liability Insurance Policies written in Illinois.

It is hereby agreed that the following sections are amended and supersede any provision to the contrary:

Throughout this **Policy** the term "spouse" is replaced by the following:

>   Spouse or party who has entered into a civil union with an **Individual Insured** as recognized under Illinois law.

The definition of **Defense Costs** in all **Coverage Parts** is amended by the addition of the following:

>   **Defense Costs** does not mean salaries of the employees, officers, or salaries of staff attorneys of the **Company** or **Named Insured**.

The definition of **Loss** in all purchased **Coverage Parts** is amended by the addition of the following:

>   **Loss** does not include the multiplied portion of any multiple damage award. This definition does not exclude punitive damages, which are only payable due to vicarious liability in the State of Illinois.

The **Directors and Officers Coverage Part**, Section IV. and the **Fiduciary Liability Coverage Part** Section III.,  EXCLUSIONS, "Pollution" is amended by the addition of the following:

>   This exclusion does not apply to damage caused by heat, smoke, or fumes from a hostile fire.

The **Directors and Officers Coverage Part**, Section III. and the **Fiduciary Liability Coverage Part** Section II.,  DEFINITIONS, "**Pollutants**" are deleted and replaced by the following:

**Pollutants**                  means any solid, liquid, gaseous, bacterial, fungal, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica',

asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or
2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or
3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.
2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproduct such as mycotoxin, mildew, or biogenic aerosol.
3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.
4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

The **Directors and Officers Coverage Part**, Section III.,DEFINITIONS, **Loss**, 3. is deleted and replaced by the following:

3.  punitive or exemplary damages, except as a result of the **Insured's** own misconduct, to the extent such damages are insurable under applicable law, statue or regulation;

The **Employment Practices Coverage Part**, Section II.,DEFINITIONS, **Loss**, 5. is deleted and replaced by the following:

5.  punitive or exemplary damages, except as a result of the **Insured's** own misconduct, to the extent such damages are insurable under applicable law, statue or regulation;

The **Fiduciary Liability Coverage Part** Section II.,DEFINITIONS, **Loss**, 1.d, is deleted and replaced by the following:

d.  punitive or exemplary damages, except as a result of the **Insured's** own misconduct, to the extent such damages are insurable under applicable law, statue or regulation;

The General Terms and Conditions, Section II. EXTENDED REPORTING PERIOD, "Right to Purchase" is deleted and replaced by the following:

Right to Purchase               If the **Policy** expires, is cancelled or not renewed for any reason then the **Named Insured** shall have the right to purchase an Extended Reporting Period to report to the **Company**, as soon as practicable prior to the expiration date of the purchased Extended Reporting Period, any **Claim** or circumstance that could be expected to give rise to a **Claims** being first made against an **Insured** during the twelve (12) months, twenty-four (24) months or thirty-six (36) months after the expiration date or effective date of such cancellation or non-renewal (depending upon the Extended Reporting Period purchased).

An Extended Reporting Period shall only apply to **Claims** arising from a **Wrongful Act** which was actually or allegedly committed before the date of expiration, cancellation or non-renewal of this **Policy**, or prior to the effective date of any **Takeover**. For the purpose of this clause, the offer of renewal terms and conditions or premiums by the **Company** different from those in effect prior to renewal shall not constitute a refusal to renew.

The General Terms and Conditions, Section VI. CANCELLATION OR NON-RENEWAL, is amended by the addition of the following:

> Notices of cancellation and non-renewal will be mailed to the **Insured,** and the agent or broker of record at the last address known to the **Company** and any mortgagee or lienholder, if known.

The General Terms and Conditions, Section VI. CANCELLATION OR NON-RENEWAL, "Delivery of Notice" is deleted and replaced by the following:

Delivery of Notice

> The **Company** shall mail notice of cancellation or non-renewal with a certificate of mailing stating the effective date of cancellation or non-renewal and the specific reason(s) for cancellation or non-renewal, which shall become the end of the **Policy Period**. Proof of mailing shall be sufficient proof of notice.

The General Terms and Conditions, Section XVI. OTHER INSURANCE is deleted and replaced by the following:

> If any **Loss** resulting from any **Claim** is insured under any other valid and collectible insurance policy, other than a policy that is issued specifically excess of the insurance provided by this **Policy**, this **Policy** shall share in the proportion that the limit of the **Policy** bears to the total of the limits of all valid and collectible insurance policies covering the same **Loss.**

NOTHING HEREIN CONTAINED SHALL VARY, ALTER, WAIVE, OR EXTEND ANY OF THE TERM, PROVISIONS, REPRESENTATIONS, CONDITIONS OR AGREEMENTS OF THE POLICY OTHER THAN AS STATED ABOVE.

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of your **Policy** and takes effect on the effective date of your **Policy** unless another effective date is shown.

# INSURANCE

# POLICY

## UNITED STATES LIABILITY INSURANCE GROUP

A STOCK COMPANY

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 – USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

# INSURANCE POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.  Where required by law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

Secretary

*Lauren Railey*

President

*Thomas P. Nkerney*

# EXHIBIT 2

SUBPOENA DUCES TECUM BEFORE THE GRAND JURY

1158 (Rev 12/20)

**STATE OF ILLINOIS**

**UNITED STATES OF AMERICA**
**IN THE NAME OF THE PEOPLE OF THE STATE OF ILLINOIS**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

**COUNTY OF DU PAGE**

IN THE MATTER OF A
GRAND JURY INVESTIGATION

Case Number _____ 1/24 2023 THURSDAY

The People of the State of Illinois, to All Sheriffs of the State of Illinois, to All Coroners of the State of Illinois, GREETINGS

We command You to Summon

The DuPage Graue Mill Corporation, Inc.
5716 Fox Gate Lane, Hinsdale, IL 60521
Attention To: Bonnie Sartore, President
bonniesartore@sbcglobal.net

The DuPage Graue Mill Corporation, Inc.
8617 Thistlewood Ct, Darien, IL 60561
Attention To: Garry Bartecki, Treasurer/Agent
Email: gbartecki@comcast.net

if found, personally to be and appear before the **GRAND JURY OF DU PAGE COUNTY, ILLINOIS**, in session in

Room 3010, 505 North County Farm Road, the City of Wheaton, DuPage County, Illinois on
Tuesday, February 28, 2023                                          9:30 a.
_____ at _____ M.

and produce at the time and place aforesaid and to bring, to be used as evidence, certain instruments of writing and
purporting to be

**PLEASE PROVIDE YOUR BUSINESS AFFIDAVIT**
See Attached Exhibits

SUBPOENA MAY BE COMPLIED WITH BY SUBMITTING SAID RECORDS TO THE ATTENTION OF: **DUPAGE COUNTY STATE'S ATTORNEY'S OFFICE 503 N. COUNTY FARM ROAD, WHEATON, ILLINOIS 60187, Control #43549,** PRIOR TO THE GRAND JURY COURT DATE BY EMAIL, US MAIL OR PERSONALLY PRESENTING SAID RECORDS TO THE GRAND JURY ON THE DAT9 AND TIME LISTED ABOVE.

then, and there to testify in a matter now pending before the GRAND JURY concerning those things of which you may
have knowledge and the import of such instruments of writing, and this you shall not omit.

YOUR FAILURE TO APPEAR IN RESPONSE
TO THIS SUBPOENA WILL SUBJECT YOU
TO PUNISHMENT FOR CONTEMPT OF
COURT.

**WITNESS: CANDICE ADAMS,** Clerk of the Eighteenth
Judicial Circuit Court, and the seal thereof, Wheaton,
Illinois                                          January 20, 2023

_____
Date

*Candice Adams*
_____
Clerk of the Eighteenth Judicial Circuit

NOTICE TO WITNESS
Any questions regarding your knowledge of the
subject matter or testimony in the case should be
directed to the States Attorney or your attorney.

saoGrandJury@DuPageco.org

Control No. **43549**

All Assistant State's Attorney's personnel and staff.
Det. John Alipour-DuPage Co. Forest Preserve FPPC2300004

DuPage Attorney No. 50000
State's Attorney of DuPage County
503 N County Farm Road Wheaton, Illinois 60187
630-407-8000

**CANDICE ADAMS, CLERK OF THE 18th JUDICIAL CIRCUIT COURT ©
WHEATON, ILLINOIS 60187-0707**

## Exhibit A – The DuPage Graue Mill Corporation, Inc.

## 5716 Fox Gate Lane, Hinsdale, Illinois, 60521

DuPage Graue Mill Corporation, Inc. shall provide the following documents associated with DuPage Graue Mill Corporation, Inc. and its Endowment for the time period of January 1, 2019, through Present:

- *A list of all properties removed from the Graue Mill House and Mill.*
- *The name and address (exact location) where the Graue Mill House and Mill property are being stored.*
- *A list of all future confirmed events planned by the Corporation including contact information for partner organization, Copies of all communications, rental agreements, applications, deposits for each event.*
- *Copies of all financial and accounting documents and statements including;*
  - o *All accounting ledgers in a detailed format*
  - o *All payroll records*
  - o *All bank account(s) and statement(s) associated with, the DuPage Graue Mill Corporation from January 1, 2019, to present.*
- *Copies of the all Endowment(s) records, establishing the endowment, bank account(s) and statement(s) from January 1, 2019, through the present.*
- *Copies of all Financial Statements from the years, 2020, 2021 and 2022*
- *Copies of all Annual Report for the years 2019, 2020, 2021 and 2022*
- *Detailed records of original entry that substantiate cash receipts, expenses, reimbursements to employees and/or Board Members for the years 2019, 2020, 2021 and 2022*
- *Federal Tax returns for the years 2019, 2020, 2021 and 2022*
- *State of Illinois tax returns for the years 2019, 2020, 2021 and 2022*
- *All IRS Forms and/or back-up withholding documents for the years 2019, 2020, 2021 and 2022.*
- *All meeting minutes from board meetings and actions executed by the DuPage Graue Mill Corporation.*
- *The bylaws of the Corporation and all subsequent corporations that were established to serve or supplement the DuPage Graue Mill Corporation, The Graue Mill, Graue House, and/or parcel(s) of the Graue facilities owned by the Forest Preserve District of DuPage County that have received funding from the DuPage Graue Mill Corporation greater than five thousand dollars ($5,000.00).*
- *All financial records, accounting documents, bank statements, financial report filings, federal tax returns, federal tax documents, state of Illinois tax returns, state tax returns, annual report filings, financial audit reports, detailed records of revenues, cash receipts, expenses, payroll, and any other acceptance of cash, cash equivalents, donated property, and/or other assets of the Foundation.*
- *The detailed list of "Fine Art" required by the DuPage Graue Mill Corporation Insurance provider and all other associated listings provided to the insurance provider.*

## AFFIDAVIT

1. I, _____, am a duly authorized custodian of records of _____ with authority to execute this affidavit and certify to the authenticity and accuracy of the records produced with this affidavit pertaining to Subpoena Duces Tecum Control No. _____ .

2. I hereby certify that the documents submitted herewith are the original records or duplicates of original records in our possession and control that are specified in the aforementioned Subpoena Duces Tecum.

3. I further certify that the documents submitted herewith are computer-generated records created with standard computer equipment and software using standard processes customarily used to generate such documents. The computer equipment used to generate the document generates accurate records when used appropriately. The computer and software were functioning properly and used appropriately.

4. The computer system and software used to generate the documents submitted are regularly checked and tested for reliability and its access is restricted to trained personnel who had been authorized to use it.

5. The source of information contained in the submitted documents and the method of recording are used in the ordinary course of regularly conducted business.

6. The records attached to the response to the Subpoena Duces Tecum were made and kept in the course of regularly conducted business activity, and it was the regular practice of this company's regularly conducted business activity to make such records.

7. The records were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____

Subscribed and sworn to before me
This _____ day of _____, 2023

_____
Notary Public



**ROBERT B.BERLIN**
**STATE'S ATTORNEY**
DU PAGE COUNTY, ILLINOIS

DATE: _1/24/2023_  Control # _43549_

Fax# / Note: ___*Email*___

COMPANY NAME: _The DuPage Grove_

# Attention:

**When responding to the Grand Jury Subpoena: in regard to complying of the requested information, future communications/ questions and or billing:**

1. Please reference our 5 digit CONTROL **#** _____ located at the bottom of the Subpoena & include a copy of the Grand Jury Subpoena.

**PLEASE NOTE OUR NEW EMAIL ADDRESS: saoGrandJury@dupageco.org**

All records / responses to the information being requested by the Grand Jury can be mailed to:    DuPage County States' Attorney
503 N. County Farm Rd
Wheaton, IL 60187
**ATTENTION: Elizabeth Giesel or Rachel Sedlacek** GJ# (insert **control #** here)

**We prefer your responses/records to be Emailed or send your questions to:**

PLEASE NOTE NEW EMAIL ADDRESS
**saoGrandJury@dupageco.org**

Phone: 630-407-8090     Fax: 630-407-8101

# EXHIBIT 3

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL COURT
DUPAGE COUNTY, STATE OF ILLINOIS

FOREST PRESERVE DISTRICT OF       )
DUPAGE COUNTY,                    )
                                  )
                                  )          2023MR000062
        Plaintiffs,               )    Case No.
                                  )
    v.                            )
                                  )          Candice Adams
DUPAGE GRAUE MILL CORPORATION,    )          e-filed in the 18th Judicial Circuit Court
An Illinois Not-for-Profit Corporation, and  )   DuPage County
DUPAGE GRAUE MILL FOUNDATION,     )          ENVELOPE: 21295585
An Illinois Not-for-Profit Corporation,      )   2023MR000062
                                  )          FILEDATE: 2/1/2023 3:35 PM
                                  )          Date Submitted: 2/1/2023 3:35 PM
        Defendants.               )          Date Accepted: 2/2/2023 9:33 AM
                                  )          MM

## <u>VERIFIED COMPLAINT FOR ACCOUNTING</u>

**NOW COMES,** Plaintiff, **FOREST PRESERVE DISTRICT OF DUPAGE COUNTY**

**("FOREST PRESERVE"),** a body corporate and politic by its attorneys, Jeffrey M. Jacobson

and John Pcolinski, as and for its Verified Complaint for Accounting Defendants, DUPAGE

GRAUE MILL CORPORATION, an Illinois Not-for-Profit Corporation and DUPAGE GRAUE

MILL FOUNDATION, an Illinois Not-for-Profit corporation, alleges as follows:

1.      That Plaintiff is a body politic and corporate, created, organized and existing under

an Act of the General Assembly of the State of Illinois, 70 ILCS 805/et seq,, "Downstate Forest

Preserve District Act."

2.      Defendant, DuPage Graue Mill Corporation (**"Graue Corp."**), is a corporation

registered with the State of Illinois. It was first incorporated on July 8, 1950.

3.      Upon information and belief, Graue Corporation's Articles of Incorporation state

is purposes were to maintain and operate Graue Mill and House.

4.      Defendant, DuPage Graue Mill Foundation (**"Graue Foundation"**), is a

1

corporation registered with the State of Illinois. It was first incorporated on September 22, 2021.

5.      The Graue Mill and House are locating in Oak Brook, DuPage, Illinois.

6.      The Forest Preserve owns the Graue Mill and House.

7.      The Graue Mill was built in 1852, by Frederick Graue. It was operated by him until around 1920.

8.      In 1934, under the ownership of the Forest Preserve, the mill was restored to the 1860s period.

9.      In 1975, the Graue Mill was listed in the national Register of Historical Places.

10.     In 1981, the Graue Mill was recognized as an Illinois Historic Mechanical Engineering Landmark by the American Society of Mechanic Engineers. Only 5 landmarks have been designated in Illinois.  Other notable Illinois recipients are Cryogenic Cooling system at Fermilab and Pioneer Zephyr.

11.     Since 1950 **Graue Corp.** has operated and maintained Graue Mill and House pursuant to a series of Licensee Agreements in substantially the same form through December, 2002.

12.     During that time **Graue Corp.** received substantial donations of artifacts and funds for the benefit of Graue Mill  and House and Forest Preserve ("**Accessions**").

13.     Those **Accessions** were completed gifts which the donors intended to benefit Graue Mill and House and Forest Preserve.

14.     On March 19, 2019, the Forest Preserve approved Ordinance 19-095,and entered into a license agreement between Forest Preserve and **Graue Corp.** (2019 Agreement). See **Exhibit A**.

15.     The 2019 Agreement terminated on December 31, 2021.

2

16.     On November 2, 2021, the Forest approved Ordinance 21-304 which extended the term of the 2019 Agreement one year to December 31, 2022. (2021 Agreement) See **Exhibit B**.

17.     On December 31, 2022, the 2021 Agreement expired.

18.     Prior to the expiration of the 2021 Agreement, the Forest Preserve communicated with the **Graue Corp** that the Forest Preserve would be handling the operations of the Graue Mill and house starting January 1, 2023.

19.     On December 31, 2022, the **Graue Corp** began taking historical and valued items from the Graue Mill and House.

20.     After December 31, 2022, all the walls were bare of pictures and artifacts. The only thing left were markers designating what was once there. The place was strewn with garbage, food and beverages. Left was a bag of shredded documents that appear to be financial documents.

21.     All of the accession records, financial records, guest logs and other documents were taken, but the binders with the labels of what was contained in the binders were left.

23.     The 2019 Agreement states that "Upon termination of this Agreement for any reason, a complete copy of all books and records as identified above shall be provided by the LICENSEE to the DISTRICT". Paragraph 3.15.

24.     The books and records are:

    a.  Books of original entry, such as cash receipts;

    b.  An accounting of expenditures prepared in a businesslike manner with approved documentation for each expenditure; and

    c.  Documentation required to verify payment of applicable state, federal and local taxes, such as, but not limited to, tax returns.

    d.  A written inventory of all trade fixtures, equipment, and other items

      e.   purchased with income generated through operation of the LICENSE PREMISES.

25.     Although often requested by Plaintiff to do so, Defendants have failed, neglected, and refused and does now fail, neglect, and refuse to account to Plaintiff for all money and assets received by it and paid out by it and to pay over to Plaintiff the amount due Plaintiff.

26.     Upon information and belief substantially all of the funds previously donated to **Graue Corp.** for the benefit of Graue Mill and the Forest Preserve District of DuPage County have been transferred to **Graue Foundation**.

27.     Pursuant to Section 12.05 of the License, any change in the purpose of License is an event of default if deemed by Forest Preserve to be consistent with the Forest Preserve intention.

28.     Section 2.10 of the License provides that upon dissolution of the Graue Corporation all assets become the assets of Forest Preserve.

29.     Upon information and belief, the Graue Foundation was created for purposes of frustrating Forest Preserve's rights pursuant to Section 2.10 and the transfer of assets occurred and the numbers and directors intend to cause Graue Corporation to confirm to exist as an entity insofar as the Illinois Secretary of State in concerned but to conduct no meaningful business.

## RELIEF REQUESTED

Therefore, Plaintiff asks that:

A.  Defendants be compelled to account as to all transactions since January 1, 2013 in connection with the Agreement described above;

B.  Defendant to account for all items that were on the Graue Mill and Graue House or where donated to the Graue Mill or Graue House; and

B.  Defendants be ordered to pay to Plaintiff any sums found due on the accounting.

Respectfully submitted,

**FOREST PRESERVE DISTRICT OF DUPAGE**,
ILLINOIS, a body corporate and politic,

By:_____
            Attorneys for Plaintiff

Jeff Jacobson, General Counsel
DuPage Attorney No.6205762
**Forest Preserve District of DuPage County**
3S580 Naperville Road
Wheaton, IL  60187

John J. Pcolinski, Jr.
DuPage Attorney No. 313085
**GUERARD, KALINA & BUTKUS**
310 S. County Farm Road, Suite H
Wheaton, IL 60187
(630) 665-9033 x18
john@johnpcolinskilaw.com
G:\Documents\JOHN\DUPAGE        COUNTY        FOREST        PRESERVE\GRAUE
MILL\ComplaintforAccounting .docx

5

STATE OF ILLINOIS     )
                            )    SS.
COUNTY OF DUPAGE    )

## **VERIFICATION**

I, KARIE FRILING, as EXECUTIVE DIRECTOR of **FOREST PRESERVE DISTRICT OF DUPAGE COUNTY** under penalty of perjury, as provided by law, pursuant to Section 1-109 of the Illinois Code of Civil Procedure, that I have read the foregoing Complaint, that I know the contents thereof, and that the statements set forth therein are true and correct except as to matters specifically alleged to be on information and belief, and that those matters I believe to be true.

By: _____
KARIE FRILING, Executive Director

SIGNED AND SWORN TO BEFORE ME
this *1st* day of February, 2023.

_____
Notary Public

JUDITH A. MALAHY
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires Jan 18, 2026

6

Candice Adams
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 21295585
2023MR000062
FILEDATE: 2/1/2023 3:35 PM
Date Submitted: 2/1/2023 3:35 PM
Date Accepted: 2/2/2023 9:33 AM
MM

2023MR000062

**ORDINANCE #19-095**

## AN ORDINANCE AUTHORIZING A LICENSE AGREEMENT BETWEEN THE FOREST PRESERVE DISTRICT OF DUPAGE COUNTY AND THE DUPAGE GRAUE MILL CORPORATION, INC., FOR THE OPERATION OF THE GRAUE MILL AND HOUSE

WHEREAS, the FOREST PRESERVE DISTRICT OF DUPAGE COUNTY, ILLINOIS, hereinafter referred to as "DISTRICT," has the power to acquire and hold lands for forest preserve purposes pursuant to the provisions of the Downstate Forest Preserve District Act, 70 ILCS 805/0.001 et seq.; and

WHEREAS, the DISTRICT is the owner of property commonly known as the Fullersburg Woods Forest Preserve; and

WHEREAS, in the Fullersburg Woods Forest Preserve there is, and has been since 1852, a structure of unusual historic interest known as the Graue Mill, and there is, and has been since 1860, a structure of unusual historic interest known as the Graue House, both of which have been repaired and restored; and

WHEREAS, it is desirable to maintain and operate the Graue Mill and Graue House as permanent historical exhibits for the education and recreation of the public; and

WHEREAS, the DISTRICT has determined that the most efficient and cost-effective manner of operating the Graue Mill and Graue House is through the services of an outside organization; and

WHEREAS, the DUPAGE GRAUE MILL CORPORATION, INC., hereinafter referred to as "LICENSEE," is an Illinois not-for-profit corporation, which was incorporated for the purposes which include assisting the DISTRICT in the operation and management of the Graue Mill; and

WHEREAS, the Downstate Forest Preserve District Act further authorizes the DISTRICT to issue licenses for any activity reasonably connected with forest preserve purposes; and

WHEREAS, LICENSEE has continuously operated and managed the Graue Mill since January 1951 through agreements with the DISTRICT and has operated and managed the Graue House since December of 2001; and

WHEREAS, the Current License Agreement (Ordinance No. 12-599) terminates on March 30, 2019; and

WHEREAS, the DISTRICT desires to continue its relationship with LICENSEE with respect to the operation and management of the Graue Mill and the Graue House as provided for herein.

NOW, THEREFORE, BE IT ORDAINED by the Board of Commissioners of the Forest Preserve District of DuPage County as follows:

1. The recitals set forth above are incorporated herein and made a part hereof.

1

Ordinance No. 19-095

# EXHIBT A

2. The President is hereby authorized and directed to sign on behalf of the District, and the Secretary is hereby authorized to attest thereto, the License Agreement attached hereto and incorporated herein as Exhibit 1 titled "License Agreement for the Operation of the Graue Mill and House."

3. The President, Executive Director and Attorney for the District are hereby authorized to take such action as may be necessary to carry out the terms of said License Agreement.

4. The Secretary is hereby directed to transmit certified copies of this Ordinance to the DuPage Graue Mill Corporation, Inc., 3800 S. York Road, Oak Brook, Illinois 60523.

PASSED AND APPROVED by the President and Board of Commissioners of the Forest Preserve District of DuPage County this 19th day of March, 2019.

APPROVED:

_____
President

ATTEST:

_____
Secretary

2                                          Ordinance No. 19-095

EXHIBIT 1

## LICENSE AGREEMENT
## FOR THE OPERATION OF THE GRAUE MILL AND HOUSE

THIS LICENSE AGREEMENT is made and entered into by and between the FOREST PRESERVE DISTRICT OF DUPAGE COUNTY, ILLINOIS, a body corporate and politic, hereinafter referred to as "DISTRICT," and the DUPAGE GRAUE MILL CORPORATION, INC., an Illinois not-for-profit corporation, hereinafter referred to as "LICENSEE."

### WITNESSETH:

WHEREAS, the DISTRICT has the power to acquire and hold lands for forest preserve purposes pursuant to the provisions of the Downstate Forest Preserve District Act, 70 ILCS 805/0.001 et seq.; and

WHEREAS, the DISTRICT is the owner of property commonly known as the Fullersburg Woods Forest Preserve; and

WHEREAS, in the Fullersburg Woods Forest Preserve there is, and has been since 1852, a structure of unusual historic interest known as the Graue Mill, and there is, and has been since 1860, a structure of unusual historic interest known as the Graue House, both of which have been repaired and restored; and

WHEREAS, it is desirable to maintain and operate the Graue Mill and Graue House as permanent historical exhibits for the education and recreation of the public; and

WHEREAS, the DISTRICT has determined that the most efficient and cost-effective manner of operating the Graue Mill and Graue House is through the services of an outside organization; and

WHEREAS, LICENSEE is an Illinois not-for-profit corporation, which was incorporated for the purposes which include assisting the DISTRICT in the operation and management of the Graue Mill; and

WHEREAS, the Downstate Forest Preserve District Act further authorizes the DISTRICT to issue licenses for any activity reasonably connected with forest preserve purposes; and

WHEREAS, LICENSEE has continuously operated and managed the Graue Mill since January 1951 through agreements with the DISTRICT and has operated and managed the Graue House since December of 2001; and

WHEREAS, the Current License Agreement (Ordinance No. 12-599) terminates on March 30, 2019; and

EXHIBIT 1

WHEREAS, the DISTRICT desires to continue its relationship with LICENSEE with respect to the operation and management of the Graue Mill and the Graue House as provided for herein.

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein, the parties agree as follows:

1.00   LICENSE GRANTED

1.01   Purpose: An exclusive license is hereby granted to the LICENSEE to operate and manage the LICENSE PREMISES, as defined in Section 1.02, as a historic educational center for furthering the purposes and objectives of the DISTRICT in the area of interpreting cultural history. In connection therewith, the Graue House may be used as a historic resource, cultural center and place where members of the public may hold meetings, conferences, seminars and other public events. The LICENSE PREMISES shall not be used for any other purpose unless prior written approval is obtained from the DISTRICT'S Executive Director.

1.02   License Premises: The LICENSE PREMISES shall consist of the buildings commonly known as the Graue Mill, the Graue House and the grounds depicted in Exhibit A, attached hereto and made part hereof.

1.03   Condition of the License Premises:   LICENSEE accepts the LICENSE PREMISES in the condition it exists as of the date of this Agreement and further agrees that acceptance is not contingent upon any demands upon the DISTRICT for any improvements, modifications or alterations. At any time during the term of the agreement, the LICENSEE may submit recommendations for consideration by the DISTRICT regarding improvements, modifications, or alterations.

1.04   Term: This Agreement shall be for a term commencing upon execution of this agreement and ending on December 31, 2021. LICENSEE may, subject to the written approval of the DISTRICT, renew this Agreement for an additional three year term, provided that a written request thereof is served on the DISTRICT'S Executive Director at least 90 days prior to the expiration of the original term. This Agreement shall not be interpreted as a lease or as creating a leasehold interest in the LICENSEE. If any court interprets this Agreement to create a leasehold interest the parties agree the leasehold shall in all circumstances expire fourteen calendar days from such ruling, order or interpretation.

2.00   LICENSEE RIGHTS

2.01   Annual Coordination and Scheduling:   LICENSEE shall have exclusive responsibility for scheduling all public and DISTRICT activities on the LICENSE PREMISES. A schedule of events for which LICENSEE will request DISTRICT staff support or services is to be submitted by March 1 of each year to the DISTRICT'S designated staff liaison. A finalized schedule of all events shall be submitted to the

EXHIBIT 1

DISTRICT'S liaison by April 1 of each year. Any changes to the final schedule which will impact DISTRICT staff or resources, shall be immediately conveyed in writing or by email to the DISTRICT and shall be subject to advance approval by the DISTRICT'S staff liaison.

2.02   Monthly Schedule:  LICENSEE agrees to provide the DISTRICT with a monthly schedule of activities and events to be held on the LICENSE PREMISES in order to enable the DISTRICT to schedule its own activities and events, as well as necessary maintenance, construction and security matters. Each month's schedule shall be submitted to the DISTRICT'S staff liaison by the 15th day of the preceding month. Any changes to the schedule presented which will impact DISTRICT staff or resources, shall be immediately conveyed in writing or by email to the DISTRICT staff liaison.

2.03   Use Limits:   LICENSEE shall not accept reservations for the LICENSE PREMISES more than 18 months prior to the date sought to be reserved unless written authorization is obtained from the DISTRICT'S Executive Director.

2.04   Improvements:  LICENSEE may, at its expense, make or construct or cause to be constructed additions, alterations, repairs or other improvements to the LICENSE PREMISES, provided written approval therefor is first obtained from the DISTRICT'S Executive Director for improvements up to $20,000, or from the DISTRICT'S Board of Commissioners for improvements in excess of $20,000. Absent a written agreement to the contrary, LICENSEE shall not be entitled to reimbursement of the value of any improvements made to the LICENSE PREMISES.

2.05   Caterers:  LICENSEE may contract with caterers to provide food and beverage service for functions held on the LICENSE PREMISES. LICENSEE shall be responsible for reviewing and approving the qualifications of each caterer and ensuring that caterers supplying food and beverage services comply with all applicable federal, state and local laws, rules and regulations concerning the preparation and furnishing of food, beverages and alcoholic beverages.

2.06   License Staff:  LICENSEE shall employ sufficient personnel to operate and manage the LICENSE PREMISES, and shall discipline any employee whose conduct or activity shall, in the reasonable exercise of discretion, be deemed to be detrimental to the interest of the public utilizing the LICENSE PREMISES. The DISTRICT shall also have the authority to remove any employee or volunteer from the LICENSE PREMISES whenever the Executive Director or DISTRICT law enforcement determines such action to be in the DISTRICT'S best interest. The DISTRICT will make a reasonable attempt to contact the LICENSEE upon taking such action. The DISTRICT agrees to support recruitment efforts for the LICENSEE'S volunteer program, as described in section 5.04 of this agreement.

2.07   Sales:  LICENSEE may sell items appropriate to its programs and events in accordance with the guidelines of the DISTRICT, and may charge admission or service fees for its programs and exhibits and for other functions held on the LICENSE

EXHIBIT 1

PREMISES. Unless specifically authorized in writing by the DISTRICT, no other group or individual utilizing the LICENSE PREMISES shall be allowed to sell any goods or items other than food or non-alcoholic beverages, nor may they charge the public any entrance, admission or service fees without the written approval of the DISTRICT.

2.08   Prices:   LICENSEE shall at all times maintain and make available to the DISTRICT and public a complete list or schedule of fair and reasonable prices for all goods and services, or combinations thereof, supplied to the public on or from the LICENSE PREMISES. The DISTRICT reserves the right to make adjustments to the prices as provided for in this Section. LICENSEE shall establish its prices on the basis of the following considerations: (1) that the LICENSEE is intended to serve the needs of the public at a fair and reasonable cost; (2) comparability with prices charged in the DuPage County area for similar goods or services; and (3) the reasonableness of prices charged in view of the cost of providing the goods or services in compliance with the obligations assumed by LICENSEE under this Agreement. In the event the DISTRICT'S Executive Director determines that the prices being charged are not fair and reasonable, the Executive Director shall notify LICENSEE thereof, and LICENSEE shall have the right to confer with the Executive Director and justify said prices. Following reasonable conference and consultation thereon, LICENSEE shall make such price adjustments as required by the Executive Director, which adjustments shall then be applied to business not yet under contract. LICENSEE may appeal the determination of the Executive Director to the DISTRICT'S Board of Commissioners and its decision shall be final and conclusive. However, LICENSEE shall comply with the price adjustments ordered by the Executive Director pending the appeal and final ruling thereon by the Board of Commissioners.

2.09   Income:   The income generated by the operation of the LICENSE PREMISES shall be used by LICENSEE to cover all expenses arising from the operation of the LICENSE PREMISES, including utilities, real estate taxes, leasehold taxes or other assessments (if any), salaries, supplies, rentals, and service fees. After the payment of all expenses, LICENSEE shall use the income to make improvements to the LICENSE PREMISES as described in section 2.04; to purchase furnishings, equipment and other items necessary for operation of the LICENSE PREMISES; and to support present and future License programs and activities.

2.10   Disposition of Income and Assets:   Upon dissolution of the corporation, any remaining income, endowment funds, and assets that were acquired by the corporation as a LICENSEE of the DISTRICT shall become property of the District to be used for the betterment of the Graue Mill, Graue House, and the surrounding property. No furnishings, equipment and other items purchased with the income generated from the operation of the LICENSE PREMISES shall be disposed of without the written permission of the Executive Director. The By-Laws of the LICENSEE shall state that upon dissolution of the corporation, any remaining income, endowment funds, and assets that were acquired by the corporation as a LICENSEE of the DISTRICT shall become property of the District.

EXHIBIT 1

2.11   Fixtures:  LICENSEE shall not install any fixtures on the LICENSE PREMISES without the written approval of the DISTRICT'S Executive Director.  As used in this Agreement, "fixture" means any item or article which is permanently attached to the LICENSE PREMISES or which is attached in such a manner that its removal would result in substantial damage to the LICENSE PREMISES.  All fixtures installed by LICENSEE shall become the property of the DISTRICT.  LICENSEE shall not be entitled to reimbursement for the value of any fixture installed on the LICENSE PREMISES.

2.12   Signs:  LICENSEE may erect any permanent sign it determines necessary for the operation of the LICENSE PREMISES, but only if prior written approval therefor is obtained from the DISTRICT'S Executive Director. The DISTRICT, after consultation with the LICENSEE, but not requiring the LICENSEE'S permission, may erect such signs, as it deems necessary for identification, directions and the operation of the LICENSE PREMISES and adjacent areas. The party who erected or caused to be erected each sign shall pay the costs related to the erection and maintenance of any sign. LICENSEE shall have available one-half of each side of the Visitor Information sign located adjacent to the York Road parking lot and use of the Visitor Information sign located southwest of the Graue Mill for posting information relating to LICENSEE'S programs and events. The DISTRICT shall not be responsible for maintaining any memorials of other plaques on the LICENSE PREMISES during or beyond the term of this agreement. In addition, LICENSEE or an organization or a group holding an event on the LICENSE PREMISES may display temporary signs for the sole purpose of identifying the location of and direction to the event, provided that the signs shall not be larger than 24" x 30" and shall be removed immediately upon the conclusion of the event. Temporary signs of larger sizes or other purposes may be permitted, subject to advance approval and terms determined by the DISTRICT'S staff liaison.   No temporary sign shall be attached to any tree, shrub or other DISTRICT landscaping or to any post, building, existing sign, gate or other structure.  No temporary sign shall contain any political or commercial advertisement or endorsement.

2.13   Sub-licensing:  LICENSEE shall not sub-license use of the LICENSE PREMISES for any purpose.

2.14   Grants:  LICENSEE acknowledges that the LICENSE PREMISES has been listed in the National Register of Historic Places.  In recognition thereof, LICENSEE shall not knowingly apply for any federal, state or private grant, which in any manner may affect the listing. LICENSEE shall notify the DISTRICT in writing when applying for any grant and shall provide the DISTRICT with such information as may be necessary for the DISTRICT to independently determine how the grant will affect the DISTRICT. All grants are subject to final approval by the DISTRICT.

2.15   Sponsorships:  The LICENSEE may solicit sponsorships for the LICENSE PREMISES, and related displays or activities.   The LICENSEE shall notify the DISTRICT in writing before accepting any sponsorship and shall provide the DISTRICT with such information as may be necessary for the DISTRICT to independently

EXHIBIT 1

determine how the sponsorship will affect the DISTRICT. All sponsorships are subject to final approval by the DISTRICT.

### 3.00    LICENSEE RESPONSIBILITIES

**3.01    Compliance With Laws:**   LICENSEE shall comply with all applicable municipal, county and DISTRICT ordinances, with state and federal laws and regulations, and with all DISTRICT rules and regulations now in force or hereafter promulgated.  LICENSEE shall obtain from the appropriate regulatory authority all necessary permits or licenses prior to beginning the operation of the LICENSE PREMISES or the construction of any improvements permitted under Section 2.04.

**3.02    Trade Fixtures and Personal Property:**   LICENSEE shall provide such trade fixtures, equipment and other items as are required to properly operate the LICENSE PREMISES.  Within 10 days following the expiration of this Agreement, LICENSEE shall remove all trade fixtures, equipment and other items from the LICENSE PREMISES, excluding such trade fixtures, equipment and other items that were purchased from the income generated from the operation of the LICENSE PREMISES. The LICENSEE shall provide the DISTRICT with a written inventory of all trade fixtures, equipment, and other items purchased with income generated through operation of the LICENSE PREMISES.  The written inventory shall be updated annually, and submitted along with the annual financial report required by section 3.15.  If LICENSEE fails to remove its trade fixtures, equipment and other items within said 10-day period, all right; title and interest in and to such trade fixtures, equipment and other items shall vest in the DISTRICT.  In addition, the DISTRICT may charge LICENSEE for the cost of removing any trade fixtures, equipment or other items from the LICENSE PREMISES.

In the event the DISTRICT terminates this Agreement as a result of a default by LICENSEE, the DISTRICT may retain such trade fixtures, equipment and other items on the LICENSE PREMISES as is necessary, in the DISTRICT'S discretion, to mitigate any damages caused by the LICENSEE, and such trade fixtures, equipment and other items shall become the property of the DISTRICT.  If the DISTRICT elects not to retain any trade fixtures, equipment or other items, LICENSEE shall remove same from the LICENSE PREMISES within 30 days after the DISTRICT serves written notice of said election.  If LICENSEE fails to remove its trade fixtures, equipment and other items within the 30-day period, all right, title and interest in and to such trade fixtures, equipment and other items shall vest in the DISTRICT.  In addition, the DISTRICT may charge LICENSEE for the cost of removing any trade fixtures, equipment or other items from the LICENSE PREMISES.

**3.03    Temporary Structures:**   LICENSEE may place temporary structures upon the grounds of the LICENSE PREMISES which are necessary or convenient for the holding of a particular function on the LICENSE PREMISES.  As used herein, temporary structures include, but are not limited to, tents, portable stages, tables, booths, bleachers, port-a-pots, electrical power sources, water services and communication equipment.  All temporary structures shall be located in such a manner as to have the least impact on the

EXHIBIT 1

grounds and shall be removed within a reasonable time following the conclusion of the particular function. The DISTRICT reserves the right to restrict location of temporary structures if damage has occurred or where the District determines in its sole discretion that the temporary structure is not appropriate for a location based on environmental, natural or safety considerations.

3.04     Damage to District Property:  LICENSEE shall be responsible for any damage to the LICENSE PREMISES as a result of LICENSEE activities, including, but not limited to, turf and ornamental landscape features, walls, floors, stairways, planters, interior/exterior items.

3.05     Insect Abatement:     LICENSEE shall be responsible for any insect abatement that occurs on the LICENSE PREMISES.  Insect abatement shall be in accordance with DISTRICT policy and procedures.

3.06     Payment and Collection of Taxes:  LICENSEE shall collect and pay any sales tax or other required taxes in connection with the operation of the LICENSE PREMISES.

3.07     Disorderly Persons:  LICENSEE shall not allow any disorderly person to remain on the LICENSE PREMISES and shall promptly notify the DISTRICT'S Law Enforcement Department to assist with the removal of disorderly persons if necessary.

3.08     Illegal Activities:  LICENSEE shall not permit any illegal activity to be conducted upon the LICENSE PREMISES.

3.09     Habitation:  The LICENSE PREMISES shall not be used as living quarters.

3.10     Promotion:  LICENSEE shall be responsible for promoting the public use of the LICENSE PREMISES. In all major promotional materials, brochures and publications, LICENSEE shall include language to the effect that the Graue Mill and House exhibits, programs and staff are provided by the LICENSEE and that the Graue Mill, House and grounds are owned by the Forest Preserve District of DuPage County.  The DISTRICT agrees to support promotion and marketing efforts for public use of the LICENSE PREMISES, including management of website content and promotion through available communications medium, as described in section 5.05 of this agreement.

3.11     Custodial Maintenance:  LICENSEE shall be responsible for maintaining the LICENSE PREMISES in a reasonably clean, safe and sanitary condition and for performing normal custodial maintenance, including, but not limited to, sweeping of the steps and walkways to all entrances; removing snow and ice from all steps and walkways, taking care to avoid spreading chemical deicers on turf areas or other vegetation; checking for leaks and operational defects in plumbing, electrical and other mechanical systems and reporting any leaks or operational defects to the DISTRICT; replacing interior light bulbs; clearing sink and toilet drains; cleaning all restroom facilities; emptying interior waste receptacles; replacing furnace filters; and performing interior painting.

EXHIBIT 1

3.12    Sanitation:  LICENSEE shall maintain the LICENSE PREMISES in a clean and sanitary condition.  LICENSEE shall not permit any debris, refuse, offensive matter or substance constituting a health or fire hazard to remain or accumulate on the LICENSE PREMISES.  The DISTRICT will provide LICENSEE with one six-yard dumpster, which will be emptied by DISTRICT personnel once a week.  DISTRICT shall provide a sufficient number of additional trash receptacles as are required to maintain the LICENSE PREMISES in a condition acceptable to the DISTRICT.  LICENSEE shall be responsible for proper disposal of the refuse deposited in such additional receptacles.  In no event shall refuse be permitted to overflow from the dumpsters or from any receptacle.

3.13    Outdoor Articles:  LICENSEE shall, at its expense, move outdoor articles, such as, but not limited to, picnic tables, lawn furniture, portable stages, tents or portable toilets, in order to permit the DISTRICT to maintain the turf and grounds of the LICENSE PREMISES.  The DISTRICT shall reasonably accommodate the needs of LICENSEE in scheduling turf and grounds maintenance.

3.14    Botanical Exhibits:  The plans for all horticultural improvements shall be approved by the DISTRICT'S Executive Director prior to installation.  LICENSEE shall be responsible for the maintenance of all approved horticultural improvements.

3.15    Accounting and Financial Reporting:  LICENSEE shall maintain books and records for the LICENSE PREMISES in conformity with generally accepted accounting principles so as to present fairly and accurately the financial position and results of operating the LICENSE PREMISES.

The books and records maintained shall consist of:

    a.    Books of original entry, such as cash receipts;

    b.    An accounting of expenditures prepared in a businesslike manner with approved documentation for each expenditure; and

    c.    Documentation required to verify payment of applicable state, federal and local taxes, such as, but not limited to, tax returns.

    d.    A written inventory of all trade fixtures, equipment, and other items purchased with income generated through operation of the LICENSE PREMISES.

LICENSEE also shall provide the DISTRICT with an independently reviewed annual report financial report.  This report shall be furnished in a timely and businesslike manner, shall be prepared by certified public accountants, and shall include a management letter.  All records and systems shall be available to the DISTRICT or its agents for inspection at any time during the term of this License Agreement. LICENSEE shall further comply with the requirements of 225 ILCS 460/5 et seq. and any related regulations promulgated by the Illinois Attorney General Charitable Trust Bureau.  Upon termination of this Agreement for any reason, a complete copy of all the books and records as identified above shall be provided by the LICENSEE to the DISTRICT.

EXHIBIT 1

3.16  Days and Hours of Operations:  LICENSEE shall as part of the annual schedule required in Section 2.01 provide the exact dates of operation for the Graue Mill. LICENSEE shall respond to all phone inquires. LICENSEE agrees to make the Graue Mill available for public use not less than 150 days per calendar year during the months of April through November.  During the dates of operation, the Graue Mill shall maintain a schedule that is consistent for the public, and generally be open from 10:00 a.m. until 4:30 p.m., Tuesday through Sunday. In addition, the Graue Mill may be open on selected Mondays due to National or State of Illinois holidays.

LICENSEE shall as part of the monthly schedule required in Section 2.02 provide the exact dates of operation for the Graue House. The general use periods for any day shall not begin earlier than 7 a.m. or last longer than 11p.m.  Any exceptions to the use hours must be approved in advance by a Special Use Permit from the DISTRICT.  All general use applications shall be processed and approved by LICENSEE on the LICENSE PREMISES. In addition, LICENSEE shall maintain reasonable hours, consistent with similar facilities in the area, for the purpose of conducting daily business relating to the operation of the LICENSE PREMISES. No changes to the days and hours of operations are to be made without the written permission of the DISTRICT'S Executive Director or his designated staff liaison.  During the hours when preserves are normally closed (beginning one hour after sunset and ending one hour after sunrise), all areas not part of the LICENSE PREMISES or the York Road parking lot shall be closed to License patrons and the public unless otherwise allowed by a Special Use Permit from the DISTRICT.

3.17  Utility and Service Charges:  LICENSEE shall be responsible for providing and paying for telephone service to the LICENSE PREMISES. In addition, LICENSEE shall be responsible for paying for all utility services to the LICENSE PREMISES, including charges for gas, electric, water and sewer.  All utility and telephone service shall be in LICENSEE'S name.  LICENSEE hereby waives any and all claims against the DISTRICT for compensation for loss or damage caused by any defect, deficiency or impairment in any utility, water supply, drainage, waste, septic, sewer, heating or gas system, or in any electrical apparatus or wire serving the LICENSE PREMISES.  The DISTRICT agrees to reimburse the LICENSEE for 60% of the total electric utility charges incurred.  This is intended to cover the electric utility charges for outside security lighting.  LICENSEE shall submit a single invoice to the DISTRICT annually.  This invoice shall list the total electrical utility charges and the DISTRICT'S 60% share thereof.

3.18  Safety:  LICENSEE shall take all reasonable precautions with respect to the safety of the LICENSE PREMISES and all persons utilizing the property.  LICENSEE shall promptly correct any unsafe condition or practice under its control and shall promptly notify the DISTRICT of any such condition under the DISTRICT'S control.  Until the unsafe condition or practice is corrected, the affected area shall be closed to the public. LICENSEE shall make reasonable efforts to obtain emergency medical care for any person requiring such care as a result of illness or injury occurring on the LICENSE

EXHIBIT 1

PREMISES. LICENSEE shall also use its best efforts to fully cooperate with the DISTRICT in the investigation of any illness, injury or death occurring on the LICENSE PREMISES, including providing a prompt written report thereof to the DISTRICT'S Executive Director.

3.19    Payment of Taxes:    The rights granted herein to LICENSEE may be subject to real property or leasehold taxation or other assessment, and in that event, LICENSEE shall pay before delinquency all taxes, assessments, fees or charges which at any time may be levied by the state, county or tax or other assessment-levying body upon the LICENSE PREMISES or LICENSEE'S rights therein.

3.20    Cooperation:    LICENSEE acknowledges that the DISTRICT may, from time to time, construct improvements, alterations or additions to the LICENSE PREMISES. The construction work will be scheduled at a time mutually satisfactory to the parties. LICENSEE shall cooperate with the DISTRICT in the event the construction affects LICENSEE'S use of the LICENSE PREMISES by vacating and removing from any affected area all personal property and trade fixtures as are required by the construction. LICENSEE further agrees to cooperate with the DISTRICT with respect to the DISTRICT'S responsibility for repair and maintenance under Section 5.02 by removing any personal property or trade fixtures necessary in order for the DISTRICT to perform such repair and maintenance.

3.21    Deposit Receipts:    LICENSEE shall establish a separate account, subject to inspection at all times by the DISTRICT, and deposit into said account all advance payments and reservation deposits made by the public for functions to be held on the LICENSE PREMISES. The balance of said account shall always equal the total amount received by LICENSEE as advance payments and reservation deposits for scheduled future functions. The account shall be established in such a manner as to enable the DISTRICT to make withdrawals for the purpose of refunding deposits to the public for scheduled future events which are required to be canceled due to a discontinuance of service by LICENSEE or the total or partial destruction of the LICENSE PREMISES.

4.00    DISTRICT RIGHTS

4.01    District Improvements:    The DISTRICT may construct additions, alterations, repairs or other improvements to the LICENSE PREMISES, in which case LICENSEE shall cooperate with the DISTRICT as required under Section 3.20. In making the improvements, the DISTRICT will make every reasonable effort to avoid unnecessary destruction of or injury to the trees, shrubs, turf or other landscaping on the LICENSE PREMISES. In the event construction of a particular improvement materially interferes with the operation of the LICENSE PREMISES, as determined by the DISTRICT, LICENSEE shall suspend License operations and vacate the premises, but the terms of this Agreement shall continue in full force and effect. LICENSEE shall resume full and complete operation of the LICENSE PREMISES within 30 days following written notice from the DISTRICT'S Executive Director that the LICENSE PREMISES are free of construction debris and in operable condition.

EXHIBIT 1

4.02    Right of Entry:  Any officer, employee or agent of the DISTRICT may enter upon the LICENSE PREMISES at any and all times for the purpose of determining whether LICENSEE is complying with the terms and conditions of this Agreement, and for any other lawful purpose. In the event of an unauthorized abandonment, vacation or discontinuance of License operations for a period in excess of seven days in any ten-day period, LICENSEE hereby irrevocably appoints the DISTRICT as its agent for continuing operation of the License, and in connection therewith authorizes the officers and employees thereof to (1) take possession of the LICENSE PREMISES, including all improvements, equipment, trade fixtures, inventory and personal property thereon; (2) remove any and all persons or property on the LICENSE PREMISES and place such property in storage at the expense of LICENSEE;  (3) license or sub-license the LICENSE PREMISES; and (4) after payment of all expenses arising from such licensing or sub-licensing, apply all payments realized therefrom to the satisfaction or mitigation of all damages arising from LICENSEE'S breach of this Agreement.  Entry by the DISTRICT upon the LICENSE PREMISES for the purpose of exercising the authority herein as agent of LICENSEE shall be without prejudice to the exercise of any other rights provided for herein or by law to remedy a breach of this Agreement.

4.03    Easements:  The DISTRICT reserves the right to establish, grant or utilize easements or rights-of-way over, under, along and across the LICENSE PREMISES for utilities or public access to any portion of the Fullersburg Woods Forest Preserve, provided that the DISTRICT shall exercise such rights in a manner which, if possible, will minimize interference with the operation of the LICENSE PREMISES.

5.00    DISTRICT OBLIGATIONS

5.01    Certificate of Occupancy:  The DISTRICT shall obtain a certificate of occupancy for the LICENSE PREMISES from the appropriate building authority.  The DISTRICT makes no warranties, either express or implied, with respect to the Graue Mill, Graue House or other improvements on the LICENSE PREMISES.

5.02    Repair and Maintenance:  The DISTRICT shall be responsible for all repairs and maintenance (other than those specified in Sections 2.11, 3.11 and 3.12) to the LICENSE PREMISES and improvements located thereon, including the following: roof; exterior walls, doors and lights; basement floor and walls; concealed utility lines and pipes; hot water heater;  heating equipment; alarm equipment; central air conditioning (not window or wall units); sewer; sump pump; water drainage system; electric power system; storm windows; gutters and downspouts; exterior painting; and the surface of the driveways, parking areas, walks and steps.  The DISTRICT will repair any interior damage caused by defects or failures in the areas listed, excluding damage to fixtures (if any), personal property and trade fixtures installed by LICENSEE.  The DISTRICT shall maintain the grounds of the LICENSE PREMISES, including fertilizing, mowing, controlling weeds, pruning shrubs and trees, and maintaining fences (if any) with the exception of those approved under Section 3.14. The District shall also be responsible for removing debris from sluice trash screen.

EXHIBIT 1

5.03   Snow & Ice Removal:  The DISTRICT shall remove snow and ice as required from the York Road parking lot, sidewalks and walkways.

5.04   Volunteer Recruitment:  The DISTRICT shall provide support and guidance through its Volunteer Services department to promote awareness and participation in the LICENSEE volunteer program. The LICENSEE shall submit requests for recruitment assistance, including volunteer position descriptions and program terms, through the assigned DISTRICT liaison.  Requests for volunteer program support are subject to approval by the DISTRICT'S Executive Director.

5.05   Promotional Support and Website Management:  The DISTRICT shall assume ownership of the grauemill.org website and responsibility for hosting Internet content to promote public use of the LICENSE PREMISES. Additionally, the DISTRICT will use print and digital medium for the promotion of public activities and the Graue Mill and Graue House. The LICENSEE may request assistance in promotion and website content changes, provided a written request is submitted to the District's liaison and approved by the DISTRICT'S Executive Director. All requests should be received a minimum of 14 days prior to any anticipated deadline. The DISTRICT shall review and provide final approval of all marketing, promotions and media associated with the LICENSE PREMISES.

6.00   HOLD HARMLESS AND INDEMNIFICATION

6.01   Personal Injury, Death or Property Damage-Indemnification by Licensee: LICENSEE shall defend, save, indemnify, keep and hold harmless the DISTRICT and all of its elected officials, officers, servants, agents and employees from all damages, suits, liabilities, causes of action, costs and expenses, in law or equity, including costs of suit and reasonable attorney and expert witness fees, that may at any time arise or be claimed by any person, including the agents, servants, employees or contractors of LICENSEE or the DISTRICT, on account of personal injury, sickness, death and property damage arising out of LICENSEE'S rights, responsibilities or actions under this Agreement when caused by an act or omission to act on the part of LICENSEE or its agents, servants, employees or contractors that allegedly constitutes, without limitation:

    a.  Negligence;
    b.  Creation or maintenance of a dangerous condition on the LICENSE PREMISES;
    c.  Breach of warranty, expressed or implied;
    d.  Defectiveness of any product; or
    e.  Intentional infliction of harm.

In the event any person or any partnership, corporation, company or other entity recovers a judgment or settlement against the DISTRICT or any of its elected officials, officers, agents or employees by reason of any of the aforementioned acts or omissions, LICENSEE shall indemnify same in an amount equal to the judgment or settlement,

EXHIBIT 1

provided timely notice of the suit or claim giving rise to the judgment or settlement was given to LICENSEE and LICENSEE was given a reasonable opportunity to defend the suit or claim.

6.02   Foreclosure:   LICENSEE shall defend, indemnify and hold harmless the DISTRICT from all damages, suits, liabilities, costs and expenses, in law or equity, including reasonable attorney fees, arising from any action brought by any mechanic, laborer or materialman in an action for foreclosure of mechanic's liens filed upon the LICENSE PREMISES as a result of providing labor or materials thereon at the request of LICENSEE. In the event a judgment or settlement is rendered in favor of the claimant in any such action, LICENSEE shall promptly obtain full satisfaction thereof through payment of all sums due thereon, provided LICENSEE was given timely notice of such lien or claim and a reasonable opportunity to defend said suit or claim.

6.03   Acts of God:   The DISTRICT shall not be responsible for any damages, losses, claims or liabilities created by any act of God, such as, but not limited to, flood, earthquake, wind, rain or storm, or created by forces beyond the control of the DISTRICT.

6.04   Personal Injury, Death or Property Damage-Indemnification by the District:   The DISTRICT shall defend, save, indemnify, keep and hold harmless LICENSEE and all of its officers, servants, agents and employees from all damages, suits, liabilities, causes of action, costs and expenses, in law or equity, including costs of suit and reasonable attorney and expert witness fees that may at any time arise or be claimed by any person, including the agents, servants and employees of the DISTRICT or LICENSEE, on account of personal injury, sickness, death or property damage arising out of the DISTRICT'S rights, responsibilities or actions under this Agreement, when caused by an act or omission to act on the part of the DISTRICT or its agents, servants and employees that allegedly constitutes, without limitation:

a.   Negligence;
b.   Creation or maintenance of a dangerous condition on the LICENSE PREMISES; or
c.   Intentional infliction of harm.

In the event any person recovers a judgment or settlement against LICENSEE or any of its officers, agents or employees by reason of any of the aforementioned acts or omissions, the DISTRICT shall indemnify same in an amount equal to the judgment or settlement, provided timely notice of the suit or claim giving rise to the judgment or settlement was given to the DISTRICT and the DISTRICT was given a reasonable opportunity to defend said suit or claim.

Nothing in this Section 6.04 or Section 6.01 shall be interpreted to waive, release or diminish any and all common law or statutory privileges and immunities of either party which privileges and immunities are specifically reserved by the Parties in their entirety.

EXHIBIT 1

6.05    Acts of God: LICENSEE shall not be responsible for any damages, losses, claims or liabilities created by any act of God, such as, but not limited to, earthquake, flood, storm, wind or rain, or created by any forces beyond the control of LICENSEE.

7.00    DESTRUCTION OF THE LICENSE PREMISES:

7.01    Election by the District: If the LICENSE PREMISES are totally or partially destroyed by fire, earthquake, flood, storms, war, insurrection, riot, public disorder or any other casualty, the DISTRICT may, at its option, either restore the LICENSE PREMISES or terminate this Agreement.    If the DISTRICT elects to restore the LICENSE PREMISES, this Agreement shall continue in full force and effect, except that License operations may, as determined by the DISTRICT, be suspended during the period of restoration. LICENSEE shall cooperate in the restoration of the LICENSE PREMISES by vacating and removing therefrom all trade fixtures and personal property for such periods as is required for the restoration.

8.00    INSURANCE

8.01    General Requirements: LICENSEE shall procure, maintain and keep in force for the term of this Agreement policies of property, liability and, if applicable, workers' compensation and employer's liability insurance.    Such policies shall be issued by companies authorized to do business in the State of Illinois and approved by the DISTRICT.    The policies to be provided and maintained by the LICENSEE are as follows:

(a) Commercial general liability insurance with limits of not less than $1,000,000 per occurrence bodily injury/property damage combined single limit; $2,000,000 aggregate bodily injury/property damage combined single limit. The policy of commercial general liability insurance shall provide coverage for all liability for bodily injury, sickness, death and property damage arising from activities conducted on the LICENSE PREMISES and shall include coverage for (i) food and beverages served and all other goods sold or services rendered on the LICENSE PREMISES; (ii) host liquor liability; and (iii) contractual liability for the obligations assumed by LICENSEE under Section 6.01. An endorsement for volunteers CG-20-21 is required for LICENSEE who utilizes volunteer personnel services on the LICENSE PREMISES.

(b) Comprehensive motor vehicle liability insurance with limits of not less than $1,000,000 per accident bodily injury/property damage combined single limit covering LICENSEE'S owned, non-owned and rented vehicles.

(c) Umbrella/excess liability insurance with limits of not less than $2,000,000 per occurrence bodily injury/property damage combined single limit. The umbrella/excess insurance shall provide coverage in excess of the insurance specified in subsections (a) and (b) above.

EXHIBIT 1

(d) Property insurance providing coverage against fire and extended coverage perils for all personal property, articles and equipment owned or leased by LICENSEE which are situated on the LICENSE PREMISES. The property coverage shall cover losses on a replacement-cost basis.

(e) Dramshop liability insurance with limits of not less than $1,000,000 per occurrence bodily injury (including loss of support)/property damage combined single limit.

(f) Workers' compensation and employer's liability insurance, including coverage for occupational diseases, covering all of the LICENSEE'S employees who perform work on the LICENSE PREMISES. Limits for the workers' compensation coverage shall be those required by the applicable workers' compensation statutes for the State of Illinois. Limits for the employer's liability coverage shall be not less than $500,000 each accident/injury; $500,000 each employee/disease; $500,000 policy limit. In the event, LICENSEE has no employees covered under the applicable workers' compensation statutes; LICENSEE shall file with the DISTRICT'S Executive Director a statement to the effect in lieu of the policies required under this subsection. If at any time LICENSEE hires any person or persons covered by the applicable workers' compensation statutes, LICENSEE shall immediately obtain policies of workers' compensation and employer's liability insurance meeting the requirements hereinabove stated and shall file evidence thereof with the DISTRICT'S Executive Director as provided for in Section 8.03.

8.02   <u>Additional Insured</u>:  LICENSEE shall obtain endorsements specifically naming the DISTRICT as an additional insured in the amounts specified for all coverages required in subsections (a), (c) and (e) of Section 8.01. The endorsements shall protect and inure to the benefit of the DISTRICT and its representatives, including, but not limited to, its officers, elected officials and employees.

8.03   <u>Evidence of Insurance</u>:  LICENSEE shall furnish the DISTRICT with a certificate of insurance for each policy required herein. In addition, when requested by the DISTRICT, LICENSEE shall furnish copies of the actual policies and endorsements showing the coverages enumerated herein to be provided by LICENSEE. All such certificates and policies shall provide that no change, modification or cancellation of any insurance shall become effective until the expiration of 30 days after written notice thereof shall have been given by the insurance company or companies to the DISTRICT.

8.04   <u>Caterer's Insurance</u>:  In the event LICENSEE contracts with a caterer to provide any food or beverage service for a function held on the LICENSE PREMISES, LICENSEE shall require such caterer to obtain the insurance coverages provided for in subsections (a), (b), (e), and (f) of Section 8.01 at the limits specified therein, provided, however, that the insurance specified in subsection (e) shall not be required if no alcoholic beverages are to be served at the function. LICENSEE shall also require the

EXHIBIT 1

caterer to name the DISTRICT as an additional insured under the insurance coverages referred to in subsections (a) and (e) and to provide the DISTRICT with evidence of the insurance to the same extent as required of LICENSEE under Section 8.03. In addition to requiring the caterer to obtain the aforementioned insurance coverages, LICENSEE shall require the caterer to defend, hold harmless and indemnify the DISTRICT and all of its officers, elected officials, agents and employees from any loss, damage, liability, cause of action, fine, judgment or settlement, together with all costs and expenses related thereto (including reasonable attorney and expert witness fees), that may arise as a result of bodily injury, sickness, death or property damage, or as a result of any other claim or suit of any nature whatsoever caused by or in any manner connected with, directly or indirectly, any act or omission by the caterer in performing services on the LICENSE PREMISES.

8.05    Operation of License:    Operation of the LICENSE PREMISES shall not commence until LICENSEE has complied with the aforementioned insurance requirements, and shall be suspended during any period that LICENSEE fails to maintain said policies in full force and effect. Additionally, in the case of LICENSEE'S failure to maintain the required insurance coverages, the DISTRICT may, at its discretion, either terminate this Agreement or procure such insurance and pay all premiums in connection therewith, and may thereafter charge said premiums to LICENSEE. LICENSEE shall pay the bill submitted by the DISTRICT within ten days of service of notice thereof as provided for in Section 19.01.

9.00    TRANSFERS

9.01    Sub-license or Assignment:    LICENSEE shall not, without the written consent of the DISTRICT, assign, sell, sub-license, hypothecate, mortgage or in any manner transfer its interest in this Agreement.    Any attempted assignment, sale, sub-licensing, hypothecation, mortgage or transfer without the written consent of the DISTRICT shall constitute a default under this Agreement.

9.02    Binding on Transferee:    The provisions set forth in this Agreement shall be binding on each approved transferee, and LICENSEE shall provide each transferee with a copy of this Agreement.

10.00    DISCRIMINATION PROHIBITED

10.01    Equal Opportunity:    In operating the LICENSE PREMISES, LICENSEE shall comply with the provisions of the Illinois Human Rights Act, 775 ILCS 5/1-01 et seq. and with all rules and regulations established or enacted by the Department of Human Rights. LICENSEE further agrees that it will not deny employment to any person or refuse to enter into any contract for the performance of any work or service of any kind by, for or on its behalf with respect to the operation of the LICENSE PREMISES on the ground of unlawful discrimination as defined in the Illinois Human Rights Act.

EXHIBIT 1

10.02 <u>A.D.A Compliance</u>: In operating the LICENSE PREMISES, LICENSEE shall comply with all applicable provisions of the American with Disabilities Act, and the rules and regulations related thereto. The DISTRICT shall be responsible for ensuring structural compliance with the Americans with Disabilities Act.

10.03 <u>Equal Use</u>: The use of LICENSE PREMISES shall be open on an equal basis to all residents of DuPage County.

11.00 <u>TERMINATION</u>

11.01 <u>Without Cause</u>: Either the DISTRICT or LICENSEE may terminate this Agreement without cause. Such termination shall be effective not sooner than 90 days after written notice thereof has been served in accordance with Section 19.00.

11.02 <u>For Cause</u>: This Agreement may be terminated for cause by either party upon the occurrence of any one or more of the events of default hereinafter described in Section 12.00. As a condition precedent to termination under this Section, the party desiring termination shall give the other party (a) 14 days written notice by registered or certified mail, return receipt requested, of the date set for termination and the grounds therefor, and (b) an opportunity to be heard on or before the date set for termination, if written request is made therefore.

11.03 <u>Damages</u>: Upon termination pursuant to Section 11.02, the DISTRICT shall have the right to take immediate possession of the LICENSE PREMISES. LICENSEE shall remove all personal property from the LICENSE PREMISES within 90 days of the date of termination. If LICENSEE fails to remove its personal property within said 90-day period, all right, title and interest in and to such property shall vest in the DISTRICT. If the termination was the result of a default by LICENSEE, the DISTRICT may take possession of all LICENSEE owned trade fixtures and personal property located on the LICENSE PREMISES for the purpose of satisfying or mitigating any and all damages arising from LICENSEE'S breach of this Agreement.

11.04 <u>Guarantee of Rights</u>: Action by the DISTRICT to effectuate a termination and forfeiture of possession shall be without prejudice to the exercise of any other rights provided herein or by law to remedy a breach of this Agreement.

12.00 <u>EVENTS OF DEFAULT: The following shall constitute some but not all acts of default and shall be cause for termination pursuant to Section 11.02 of this License Agreement.</u>

12.01 <u>Abandonment</u>: The unauthorized abandonment or vacation of the LICENSE PREMISES by LICENSEE for more than seven days in any 10-day period.

12.02 <u>Failure to Maintain</u>: The failure on the part of LICENSEE to maintain the LICENSE PREMISES in a clean, sanitary and safe state of repair where such condition

EXHIBIT 1

continues for more than 10 days after written notice from the DISTRICT'S Executive Director to correct the condition.

12.03 Bankruptcy: The filing of a voluntary petition in bankruptcy by LICENSEE; the adjudication of LICENSEE as bankrupt; the appointment of a receiver of LICENSEE'S assets; the making of a general assignment for the benefit of creditors; a petition or answer seeking an arrangement for the reorganization of LICENSEE under any Federal Reorganization Act, including petitions or answers under Chapters X or XI of the Bankruptcy Act; the occurrence of any act which operates to deprive LICENSEE permanently of the rights, powers and privileges necessary for the proper conduct and operation of the LICENSE PREMISES; or the levy of any attachment or execution which substantially interferes with LICENSEE'S operations under this Agreement and which attachment or execution is not vacated, dismissed, stayed or set aside within a period of 60 days.

12.04 Discrimination: A determination by the appropriate regulatory state or federal agency that a violation of civil rights under the Americans with Disabilities Act or discrimination has been practiced by LICENSEE in violation of state or federal laws and where action to correct or mitigate the situation is not properly taken. Such action shall be suitable to the regulatory agency making a finding of discrimination.

12.05 Change in Corporate Purpose: Any changes in LICENSEE'S corporate purposes which, in the discretion of the DISTRICT, are inconsistent with forest preserve purposes.

12.06 Failure to Notify: The failure by LICENSEE to provide the DISTRICT with written notification of any change in LICENSEE'S corporate purposes at least 30 days prior to the effective date of such change.

12.07 Failure to Perform - Licensee: The failure of LICENSEE to keep, perform and observe all other promises, covenants and conditions set forth in this Agreement, where such failure continues for more than 30 days after receipt of written notice from the DISTRICT'S Executive Director demanding correction thereof, provided that where fulfillment of such obligation requires performance over a period of time and LICENSEE shall have commenced to perform whatever may be required to cure the particular default within ten days after such notice and thereafter continues such performance diligently and in good faith, said time limit may be waived in the manner and to the extent allowed by the DISTRICT'S Executive Director.

12.08 Failure to Perform - District: Failure by the DISTRICT to perform within a reasonable time necessary maintenance or repairs to the LICENSE PREMISES or failure of the DISTRICT to keep, perform and observe all other promises, covenants and conditions set forth in this Agreement, where such failure continues for more than a reasonable time after receipt of written notice from LICENSEE demanding correction thereof, provided that where fulfillment of such obligation requires performance over a period of time and the DISTRICT shall have commenced to perform whatever may be required to cure the particular default within ten days after such notice and thereafter

EXHIBIT 1

continues such performance diligently and in good faith, said time limit may be waived in the manner and to the extent allowed by LICENSEE'S Board of Directors.

12.09 <u>Revocation of Occupancy Permit</u>:  Revocation by the applicable regulatory authority of the certificate of occupancy for the LICENSE PREMISES because of a defect that cannot be cured by the DISTRICT within a reasonable time.

12.10  <u>Waiver</u>:  A waiver by either party of any default of one or more of the covenants, conditions or terms of this Agreement shall not constitute a waiver of any subsequent or other default of the same or other covenant, condition or term herein contained, nor shall the failure on the part of either party to require exact, full and complete compliance with any of the covenants, conditions or terms herein contained be construed as in any manner changing the terms of this Agreement or estopping the other party from enforcing the full provisions contained herein.  No delay, failure or omission of the DISTRICT to re-enter the LICENSE PREMISES or of either party hereto to exercise any right, power, privilege or option arising from any default, nor any subsequent acceptance of payments then or thereafter accrued shall impair any such right, privilege or option, or be construed as a waiver or of acquiescence in such default or as a relinquishment of any right.  Time is of the essence of this Agreement.  No notice to LICENSEE shall be required to restore or revive "time is of the essence" after the waiver by the DISTRICT of any default.  No option, right, power, remedy or privilege of either party hereto shall be construed as being exhausted by the exercise thereof in one or more instances.  The rights, powers, privileges and remedies given the parties by this Agreement shall be cumulative.

12.11  <u>Other Material Breaches</u>:  Such other material breaches of this License Agreement.

13.00  <u>SURRENDER</u>

13.01  <u>Vacation of Premises</u>:  Upon the expiration or termination of this Agreement, LICENSEE shall peaceably vacate the LICENSE PREMISES and any and all improvements located thereon and deliver up the same to the DISTRICT in a reasonably good condition, ordinary wear and tear excepted.

14.00  <u>INTERPRETATION</u>

14.01  <u>Headings</u>:  The headings herein contained are for convenience and reference only and are not intended to limit the scope of any Section.

15.00  <u>INDEPENDENT CONTRACTOR</u>

15.01  In performing the obligations hereunder, LICENSEE is engaged solely in the capacity of an independent contractor and not as a representative, agent, or employee of the DISTRICT, it being expressly understood that no relationship between the parties other than that of an independent contractor has been or is intended to be created.  This Agreement does not constitute, and the parties hereto do not intend to create hereby, a

EXHIBIT 1

partnership; joint venture; or relationship of master and servant, principal and agent, landlord and tenant or lessor and lessee, as it is mutually understood and agreed that the relationship created by this Agreement and the construction of the rights and duties hereunder is to be determined in accordance with the Illinois laws relating to licensor and LICENSEE.

## 16.00 ENFORCEMENT

16.01 Responsibility: The DISTRICT'S Executive Director shall be responsible for the enforcement of this Agreement on behalf of the DISTRICT and shall be assisted therein by such officers and employees of the DISTRICT as the Executive Director deems necessary.

## 17.00 ATTORNEY FEES AND COSTS

17.01 Recovery of Costs: The prevailing party (as determined by the court) in any legal proceeding or action instituted to enforce any provision of this Agreement shall be entitled to recover from the losing party all costs and expenses incurred as a result of said proceeding or action, including reasonable attorney and expert witness fees.

## 18.00 DISTRICT LIAISON

18.01 Staff Liaison: The DISTRICT'S Executive Director will assign a staff liaison who shall be notified of all meetings of LICENSEE'S Board of Directors, and who shall have the right to attend all board meetings of the members of LICENSEE'S Board of Directors, except for those portions of meetings where license negotiations, legal proceedings, or legal actions, between the DISTRICT and LICENSEE are to be discussed. When discussed, these items shall be the last item handled before adjournments and no other business shall be conducted after the staff liaison leaves the meeting.

## 19.00 NOTICES

19.01 Mailing Requirements: All notices required to be given under the terms of this Agreement or any applicable law shall be served either (a) personally during regular business hours; (b) by facsimile during regular business hours; or (c) by certified or registered mail, return receipt requested, placed in a sealed envelope with postage prepaid and deposited in the United States mail. Notices served upon the DISTRICT shall be addressed to the Executive Director, Forest Preserve District of DuPage County, P.O. Box 5000, Wheaton, Illinois 60189-5000, or such other place as may be designated in writing by the Executive Director. Notices served upon LICENSEE shall be addressed to the DuPage Graue Mill and Museum Corporation, Inc., 3800 S. York Road, Oak Brook, Illinois 60523. Notices served personally or by facsimile transmission shall be effective upon receipt, and notices served by mail shall be effective upon receipt as verified by the United States Postal Service.

EXHIBIT 1

20.00  CONFLICT OF INTEREST

20.01  Financial Interest:  No DISTRICT Commissioner or employee shall have any financial interest, directly or indirectly, in this Agreement.

21.00  PROHIBITION OF RECORDATION

21.01  Filing With Recorder of Deeds:  This Agreement shall not, nor shall any copy thereof or any statement, paper, or affidavit in any way or manner referring hereto, be filed in the Office of the Recorder of Deeds of DuPage County, Illinois, or in any other public office by LICENSEE or anyone acting for LICENSEE, and if the same be so filed, this Agreement, at the option of the DISTRICT, may be terminated, and the DISTRICT may declare such filing a default of this Agreement.

22.00  PERMITS AND LICENSES

22.01  Alcoholic Beverages:  DISTRICT ordinances provide that alcoholic beverages may be possessed and consumed in connection with the Graue House only when food is dispensed for consumption on the premises, excluding the Graue Mill, at the Fullersburg Woods Forest Preserve.  Further, with approval of the DISTRICT'S Executive Director, alcoholic beverages may be possessed and consumed in connection with the Graue Mill during fund raising events only when food is dispensed for consumption on the premises and only when the Graue Mill is closed to the general public, at the Fullersburg Woods Forest Preserve. LICENSEE will at all times during the term of this Agreement and any extension hereof comply with all DISTRICT ordinances and with all state and local laws and see that each caterer engaged for service on the premises has secured and maintained all liquor and food dispensing licenses and permits that may be required by law. LICENSEE is hereby granted such special permission, provided that no alcohol shall be possessed or consumed outside of the LICENSE PREMISES.

23.00  ENTIRE AGREEMENT

23.01  Revocation of Previous Agreement:  This document constitutes the entire Agreement between the parties for the operation of the LICENSE PREMISES.  All other agreements, promises and representations with respect thereto are expressly revoked, as it has been the intention of the parties to provide for a complete integration within the provisions of this document and the exhibits attached hereto.  The unenforceability, invalidity or illegality of any provision of this Agreement shall not render the other provisions unenforceable, invalid or illegal.

23.02  Modifications:  This document may be modified only by further written agreement specifically referring to this Section.  Any such modification shall not be effective unless approved and executed by LICENSEE and, in the case of the DISTRICT, until approved by the Board of Commissioners and executed by the President thereof.

EXHIBIT 1

23.03 Mediation and Jurisdiction: The DISTRICT in its sole discretion may elect non binding mediation to resolve any disputes that may arise under this agreement. The Mediation shall be conducted by a professional mediator as mutually agreed by the parties. No party shall unreasonably withhold approval of a professional mediator. In absence of resolution in mediation all disputes shall be subject to the exclusive jurisdiction of the Eighteenth Judicial Circuit Court, DuPage County, Illinois.

      IN WITNESS WHEREOF, the parties have entered into this License Agreement as of the 19th day of March, 2019.

FOREST PRESERVE DISTRICT
OF DUPAGE COUNTY, ILLINOIS
P.O. Box 5000
Wheaton, IL 60189-5000

DUPAGE GRAUE MILL
CORPORATION, INC.
3800 S. York Road
Oak Brook, IL 60523

By: _____
          President

By: _____
          President

Attest: _____
             Secretary

Attest: _____
             Secretary



**EXHIBIT A**
**DuPage Graue Mill Corporation License Premises**

0  20 40    80    120   160   200   240
▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ ▬▬ Feet

N



*#21-089*



**Forest Preserve District
of DuPage County**

35580 Naperville Road
P.O. Box 5000
Wheaton, IL 60189

630.933.7200
Fax 630.933.7204
TTY 800.526.0857

dupageforest.org

## MEMORANDUM OF AGREEMENT

According to license agreement #19-095 between the Forest Preserve District of DuPage County ("District") and the Graue Mill Corporation, Inc. ("GMC"):

*2.04 Improvements: LICENSEE may, at its expense, make or construct or cause to be constructed additions, alterations, repairs or other improvements to the LICENSE PREMISES, provided written approval therefor is first obtained from the DISTRICT'S Executive Director for improvements up to $20,000, or from the DISTRICT'S Board of Commissioners for improvements in excess of $20,000. Absent a written agreement to the contrary, LICENSEE shall not be entitled to reimbursement of the value of any improvements made to the LICENSE PREMISES.*

The Forest Preserve District of DuPage County ("District") and the Graue Mill Corporation ("GMC") agree to the following:

1. GMC requests approval to make repairs to the mill operation as described in the proposal attached as "Exhibit A."

2. The work is a highly specialized repair requiring personal confidence in a specialized contractor.

3. The District approves GMC to make the proposed repairs under the following conditions:

   a) GMC shall comply with all federal, state, and locals laws, and contractors shall pay "prevailing wage" when required by Illinois law.

   b) GMC shall require the contractor to provide the District with a certificate of insurance naming the District as an additional insured and meeting the minimum requirements listed in "Exhibit B." District approval of the certificate of insurance is required before any work can be performed.

4. The District shall reimburse GMC for up to $18,000 in documented expenses related to the proposed repairs.

_____
Bonnie Sartore, President, Graue Mill Corporation, Inc.

3-30-2021
Date

_____
Ed Stevenson, Executive Director, Forest Preserve District of DuPage

3-24-2021
Date

Exhibit A

## GRAUE MILL
SITE REPORT | SCOPE RECOMMENDATION | PROPOSED BUDGET                    February 10, 2021

Graue Mill and Museum
C/O Rus Strahan
3800 York Road, Oak Brook IL 60523

Hi Rus,

Thank you for reaching out to us about Graue Mill. We've admired it for many years, and I am grateful to have this opportunity to collaborate with you in its care. It is such an important piece of our cultural history.

As you know, we performed a 3D Leica scan of the mill and rendered it in AutoCAD. We've developed a sound plan for a scope of work based on the information from this as well as my site visit on January 22nd.

I am happy to further develop the proposed scope of work if needed. Please do not hesitate to contact me with any questions or comments. The most gratifying part of my work comes from participating in projects like yours— that maintain and celebrate our rich architectural heritage by thoughtfully considering the intent of the original builders.

Let me know how we can best help.
– Rick

309-221-8020
rick@trilliumdell.com

CONTENTS

2   EXISTING CONDITIONS AND COMMENTS
3   CURRENT OBJECTIVES, PROPOSED SCOPE OF WORK
4   ORIENTATION
5-14   IMAGES AND DETAILS

EXISTING CONDITIONS AND COMMENTS

Our team has confirmed your analysis of the situation. The steel beam and steel posts installed previously are inadequate to properly transfer loads from the power source to the mill stone. Without going into much detail, and beleaguering the point, this was simply not the right solution to the problem. Only a material like timber provides the strength, flexibility and reaction required in a dynamic system such as this.

In addition, to the issue with materials– the x-axis geometry is out of alignment on the main drive shaft, due to what appears to be a variety of recent modifications. This created a cumulative effect that is resulting in negative performance.

Fortunately, there are several solutions that present themselves in this situation.

-Step one is simply to correctly replace the steel beam and steel posts with properly sized wood components.

-Step two involves rescanning the system to determine if the axis alignment is affected when the proper components are installed correctly, and asses the bearings.

CURRENT OBJECTIVES

To stabilize and repair the structure in a way that balances economy with maximizing lifespan and lowering long-term maintenance costs. All work is designed to be respectful of the original builder's intent; always using like materials and method unless another choice is more prudent.

PROPOSED SCOPE OF WORK

Engineered Stamped Drawings
1. for the replacement of the timber previously replaced with steel
   a. wood beam supporting the drive shaft (qty1)
   b. the associated timber posts (qty 2)

Fabrication
1. one (1) main beam and two (2) posts
2. wedges for lever
3. joinery to be original in appearance and performance
4. timber to be white oak, select structural

Installation
1. modify/ shorten a portion of the concrete pier installed for the steel
2. install new timber components

Test
1. re-scan the mill assembly in detail
2. render in AutoCAD
3. access the drive shaft and bearings – provide quotes of any repair as needed

CLIENT RESPONSIBILITES
   – allow transport and use of original timber for analysis at Galesburg facility
   – provide access to mill without time/day restrictions (except Sundays and/or the hours of 8pm-6am)
   – provide toilet and handwashing facilities

BUDGET: $15,600.00

SPECIAL NOTE – FUTURE WORK

If in the future you wish us to replace the bearings (or any item), or do additional repair work to the system, we can provide a quote. Some of the issues or potential problems are currently unidentifiable due to the location of the components. We will look at the entire system while we complete the scope above and prepare a report with a new scan containing detailed information.

ORIENTATION



*North is top.*

Graue Mill
3800 York Rd, Oak Brook IL 60523

IMAGES AND DETAILS



*South (entry) and West walls.*

The 1852 Graue Mill is the only operating water wheel gristmill in the Chicago area.



*South and West elevation.*

Exterior scan view.



*North and West Elevation.*

Exterior scan view.



*View of remaining grindstone still in use and yard arm.*

Pardon the blurry image. Main drive shaft is directly below the fire extinguisher (green).



*Scan section running North to South.*

Cross-section of mill with steel beam to be replaced on the bottom left.



*Close-up of Scan.*

Steel beam (boxed in yellow).
Initial scan shows lack of alignment in driveshaft axis.
Additional scans completed once the steel beam are out will clarify and allow future alignment (white).



*Steel Beam.*

Replace steel beam *(blue)* with oak of similar cross-section to original.
We will provide all engineering required.



*Detail: steel beam resting oak lever.*

The lever is missing the wedges required to support it once the mill is adjusted.
Wedges are installed in the open mortise, otherwise all the force of the mill is applied on to a 1.25"
diameter oak peg. We will provide new wedges.



*Detail: Steel Post.*

Steel post substitute *(green)* to be replaced with wooden post, per original.



*Basement Plan View.*



*Detail: Basement Plan View.*

Concrete pier must be cut shorter to allow for correct size oak beam (white).

*FIN— Thank you for the opportunity to assess this fantastic building. —Rick*

Exhibit B



### Certificate of Insurance
### Acceptable Minimum Insurance Requirements

Listed below are the minimum insurance requirements for the Forest Preserve District of DuPage County. Please provide a copy of this document to your insurance agent to determine if you and/or your company comply with the District's insurance requirements.

| TYPE OF INSURANCE | LIMITS |
|---|---|
| | |
| **General Liability** | |
| Each occurrence bodily injury/property damage combined single limit, written on "per occurrence" basis | $1,000,000 |
| General Aggregate bodily injury/property damage combined single limit | $2,000,000 |
| | |
| **Automobile Liability** | |
| Each occurrence bodily injury/property damage combined single limit | $1,000,000 |
| | |
| **Umbrella or Excess Liability** (the term "Professional" may be used in place of "Umbrella") | |
| Each occurrence bodily injury/property damage combined single limit, written on "per occurrence" basis | $1,000,000 |
| | |
| **Workers Compensation** | Statutory |
| Employer's Liability – Each accident | $500,000 |
| Employer's Liability – Disease – Each employee | $500,000 |
| Employer's Liability – Disease policy limit | $500,000 |

In addition, the certificate must have the following information listed:

1. Certificate Holder – *must* identify the Forest Preserve District of DuPage County, P.O. Box 5000, Wheaton, IL 60189 or headquarters address 3S580 Naperville Road, Wheaton, IL 60189.
2. Additional Insured Endorsement – *must* have the following or similar language: "The Forest Preserve District of DuPage County is an Additional Insured with respects to General Liability, pursuant to and subject to the policy's terms, definitions, conditions, and exclusions" (usually noted in the Description of Operations box).

Once compliance has been established, please **email a certificate of insurance** to Jack Hogan, at jhogan@dupageforest.org.

Updated: 10/22/2018

STATE OF ILLINOIS    )
                  )SS
COUNTY OF DU PAGE)

       I, JUDITH A. MALAHY, SECRETARY OF THE FOREST PRESERVE COMMISSION OF DUPAGE COUNTY IN THE STATE OF ILLINOIS, AND KEEPER OF THE RECORDS AND FILES THEREOF, DO HEREBY CERTIFY THE FOREGOING TO BE A TRUE AND CORRECT COPY OF

## RESOLUTION #19-095

PASSED BY THE BOARD OF COMMISSIONERS AT A MEETING HELD AT THE DISTRICT HEADQUARTERS, 3 SOUTH 580 NAPERVILLE ROAD, WHEATON, ILLINOIS, ON THE 19th DAY OF MARCH A.D., 2019.

       GIVEN UNDER MY HAND AND OFFICIAL SEAL AT WHEATON, ILLINOIS, THIS 1st DAY OF APRIL A.D., 2019.

SECRETARY
FOREST PRESERVE COMMISSION
DU PAGE COUNTY, ILLINOIS

2023MR000062

e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 21295585,
2023MR000062
FILEDATE: 2/1/2023 3:35 PM
Date Submitted: 2/1/2023 3:35 PM
Date Accepted: 2/2/2023 9:33 AM
MM

## ORDINANCE #21-304

**AN ORDINANCE AUTHORIZING A ONE-YEAR EXTENSION TO THE LICENSE AGREEMENT BETWEEN THE FOREST PRESERVE DISTRICT OF DUPAGE COUNTY AND THE DUPAGE GRAUE MILL CORPORATION, INC., FOR THE OPERATION OF THE GRAUE MILL AND HOUSE**

WHEREAS, the Forest Preserve District of DuPage County and the DuPage Graue Mill Corporation, Inc., have an existing License Agreement (Ordinance No. 19-095) for the Operation of the Graue Mill and House; and

WHEREAS, the License Agreement terminates on December 31, 2021; and

WHEREAS, the parties have determined that it is reasonable, necessary and desirable to extend the existing License Agreement for a period of one year.

NOW, THEREFORE, BE IT ORDAINED by the Board of Commissioners of the Forest Preserve District of DuPage County as follows:

1. The recitals set forth above are incorporated herein and made a part hereof.

2. The President is hereby authorized and directed to sign on behalf of the District, and the Secretary is hereby authorized to attest thereto, the Extension Agreement attached hereto and incorporated herein as Exhibit A.

3. The President, Executive Director, Executive Advisor and Attorney for the District are hereby authorized to take such action as may be necessary to carry out the terms of said Extension Agreement.

4. The Secretary is hereby directed to transmit a certified copy of this Ordinance to the DuPage Graue Mill Corporation, Inc.

PASSED AND APPROVED by the President and Board of Commissioners of the Forest Preserve District of DuPage County this 2nd day of November, 2021.

APPROVED:

_____
President

ATTEST:

_____
Secretary

1

Ordinance No. 21-304

# EXHIBIT B

## **EXTENSION AGREEMENT**

THIS EXTENSION AGREEMENT is entered into by and between the Forest Preserve District of DuPage County (hereinafter the "District") and the DuPage Graue Mill Corporation (hereinafter the "Corporation").

### **WITNESSETH:**

WHEREAS, the current License Agreement between the District and the Corporation for the Operation of the Graue Mill terminates on December 31, 2021; and

WHEREAS, the parties have determined that it is reasonable, necessary and desirable to extend the current License Agreement.

NOW, THEREFORE, in consideration of the promises, terms and conditions set forth herein, the parties agree as follows:

1.  The recitals set forth above are incorporated herein and made a part hereof.

2.  The terms of the current License Agreement (Ordinance No. 19-095) shall be extended in full force and effect for a period of one year, ending on December 31, 2022.

IN WITNESS WHEREOF, the District and the Corporation have entered into this Extension Agreement as of this 2nd day of November, 2021.


FOREST PRESERVE DISTRICT
  OF DUPAGE COUNTY
3S580 Naperville Road
Wheaton, IL 60189


_____
       President

_____
       Secretary


DU PAGE GRAUE MILL
  CORPORATION, INC.
3800 S. York Road
Oak Brook, IL 60523


_____
Title:_____

_____
Title:_____

# EXHIBIT 4



# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**Kwame Raoul**
ATTORNEY GENERAL

June 28, 2023

DuPage Graue Mill Corporation
3800 S. York Road
Oak Brook, IL 60523

Re:  DuPage Graue Mill Corporation (File No. 99-99,4119)

DuPage Graue Mill Corporation (the "Organization") is an Illinois charitable organization that is registered with this Office (CO# 01004368).  It is our understanding that up until recently the Organization operated a restored 19th century gristmill and house on property leased from the Forest Preserve District of DuPage County (the "Forest Preserve") under a licensing agreement between the Organization and Forest Preserve.  We further understand that parties did not extend the licensing agreement in 2023 and the Forest Preserve took back operations of the gristmill and house.  Recently we have received a complaint alleging that the Organization may be in possession of an endowment fund belonging to the Forest Preserve.  Under Illinois law, the Attorney General has the power and duty to see that charitable organizations such as the DuPage Graue Mill Corporation are properly administered.  In this regard, we are requesting that you provide the following information/materials to our Office:

1) A brief statement confirming or denying the allegations that the Organization is holding endowment funds belonging to the Forest Preserve; and

2) A brief statement outlining the Organizations plans moving forward now that it is no longer operating the gristmill and house.

I thank you in advance for your cooperation in this matter.  Please feel free to contact me if you have any questions at (773)590-7118.

Sincerely,

Pasquale Esposito
Charitable Trust Bureau
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, IL 60601